**SEASHORE PERFORMING ARTS CENTER, INC. et al.**

v.

**TOWN OF OLD ORCHARD BEACH.**

Supreme Judicial Court of Maine.

Argued Dec. 7, 1995.

Decided May 10, 1996.

Joseph V. Lenkowski (orally), Nicholas C. Scaccia, Scaccia, Lenkowski & Aranson, Sanford, for Plaintiffs.

William E. Saufley (orally), Monaghan, Leahy, Hochadel & Libby, Portland, for Defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

RUDMAN, Justice.

Seashore Performing Arts Center, Inc. (SeaPAC) appeals from the summary judgment entered in favor of the Town of Old Orchard Beach (the Town) in the Superior Court (York County, *Fritzsche, J.*) on SeaPAC's claim for rescission of its contract with the Town to buy the facility known as the Ballpark. SeaPAC also appeals from the summary judgment entered by the court in favor of the Town on its counterclaim seeking to enforce an agreement whereby SeaPAC had agreed to indemnify the Town against certain specified claims even though it failed to purchase the Ballpark. We affirm both the judgment in favor of the Town on SeaPAC's claim for rescission and the judgment in favor of the Town regarding the indemnification agreement.

In 1989 SeaPAC entered into a purchase and sale agreement to buy the Ballpark from the Town. The agreement included a provision that SeaPAC could use the Ballpark but delay the transfer of title one year at a time for three years. At the time SeaPAC and the Town executed the purchase and sale agreement they also signed two other agreements: an operating agreement to govern SeaPAC's use of the Ballpark prior to the actual transfer of title, and an indemnification agreement requiring SeaPAC to defend and indemnify the Town against certain identified claims.

At the time the purchase and sale agreement was entered into, the Town municipal ordinance set maximum nighttime noise levels at the Ballpark at 60 dBA. The Ballpark, however, abutted an area with a maximum night noise level limited by ordinance to 45 dBA. During 1990 SeaPAC produced several rock concerts at the Ballpark that precipitated controversy over the noise generated. SeaPAC and the Town officials conducted extended discussions to try to resolve the noise issue but came to no permanent solution. The Town did enact an emergency ordinance increasing the maximum allowable noise level for the Ballpark area to 75 dBA for the 1991 summer concert season. Monitoring by the Town revealed no violation of the 75 dBA ordinance during the summer of 1991. The emergency ordinance expired in August 1991, and the Town enacted a new ordinance setting 62 dBA as the maximum permitted noise level for activities at the Ballpark. Town officials knew at the time of enactment of the new ordinance that noise

levels exceeded 62 dBA at every Ballpark concert in 1991.

After the Town passed the 62 dBA noise ordinance, SeaPAC did not make the next scheduled payment to extend the date of closing and instead notified the Town it would not purchase the Ballpark. SeaPAC demanded that the Town return the promissory notes and payments SeaPAC had delivered to the Town during the course of the operating agreement. The Town refused to return the notes and funds.

SeaPAC filed a multi-count complaint against the Town seeking rescission of the purchase and sale agreement and return of SeaPAC's promissory notes and payments. The Town counterclaimed, seeking among other remedies a declaration that SeaPAC was required to fulfill its obligations under the terms of the indemnification agreement between the parties even though the sale of the Ballpark had not been consummated. Having stipulated to a dismissal of all other claims, SeaPAC appeals from the summary judgment[1] entered in favor of the Town on SeaPAC's claim for rescission and restitution and from the summary judgment entered on the Town's counterclaim declaring the indemnification agreement enforceable.

■ When reviewing the granting of a summary judgment, we view the evidence presented in the light most favorable to the party against whom the judgment has been granted and review the trial court's decision for an error of law. *Keyes Fibre Co. v. Lamarre,* 617 A.2d 213, 214 (Me.1992). A party is entitled to a summary judgment if there is no genuine issue of material fact and the party on the undisputed facts is entitled to a judgment as a matter of law. *Chadwick–BaRoss, Inc., v. T. Buck Constr., Inc.,* 627 A.2d 532, 534 (Me.1993). We review the trial court's decisions on questions of law *de novo. Bliss v. Bliss,* 583 A.2d 208, 210 (Me. 1990).

I

■ SeaPAC argues that the court, in entering a summary judgment for the Town on SeaPAC's claim for rescission and restitution, erred in finding that no genuine issue of material fact existed as to the terms of the purchase and sale agreement. In particular, SeaPAC contends that a genuine issue of fact remains as to the existence of an implied term in the contract providing that both parties intended that a facility usable for outdoor rock concerts would be conveyed. The intent of the parties in entering a contract is a question of fact. *Top of the Track Assocs. v. Lewiston Raceways, Inc.,* 654 A.2d 1293, 1296 (Me.1995).

■ SeaPAC and the Town included in their purchase and sale agreement no express term articulating a mutual intent that the facility to be conveyed would be usable for rock concerts. Contractual intent, however, may be established as an implied term outside of a purchase and sale agreement's express terms.

[A] contract includes not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made.

*Id.* at 1295. If the evidence, taken in the light most favorable to SeaPAC, supports an inference that both parties intended by an implied term of their agreement that a facility usable for rock concerts was to be conveyed, then the court erred in finding that no material issue of fact remained.

■ Even an integrated contract, such as the purchase and sale agreement between the Town and SeaPAC, may include an unwritten implied term.

The salutary purpose of [an integration clause] is to preclude consideration of matters extrinsic to the agreement. It is of no

---

1. M.R.Civ.P. 56(c) provides in pertinent part:
 Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, referred to in the statements required by Rule 7(d) show that there is no

genuine issue as to any material fact set forth in those statements and that any party is entitled to a judgment as a matter of law.... Summary judgment, when appropriate, may be rendered against the moving party.

relevance if the promise, albeit imperfectly expressed, is implicit in the contract as written.

*Id.* at 1296. In order for an unwritten provision to be implied in a contract, however, that provision must be absolutely necessary to effectuate the contract. *Id.* at 1295. Sea-PAC contends that the intent of both parties that rock concerts take place at the Ballpark is a provision absolutely necessary to the purposes of the SeaPAC–Town purchase and sale agreement and is therefore implied in the contract.

Although the record does establish that the Town knew SeaPAC intended to produce rock concerts at the Ballpark, the evidence viewed in the light most favorable to SeaPAC does not support a finding that the Town intended that rock concerts take place at the Ballpark as an absolute necessity of the purchase and sale agreement. The purchase and sale agreement in fact speaks of Sea-PAC's insistence on inspection to ensure the Ballpark's suitability "for presentation of outdoor concerts, presentation of other entertainment events, and other recreational use." The agreement goes on to state that "[i]t is the intent of Seller that Buyer shall be able to utilize the Real Estate for entertainment related purposes, including sporting events, conventions, trade shows, and performing arts, subject to the conditions set forth in this Agreement."

■ The party opposing a summary judgment has the burden of producing competent *proof of facts that would be admissible to show that a genuine issue of material fact*

exists. *Chadwick–BaRoss, Inc. v. T. Buck Constr., Inc.,* 627 A.2d at 534–35. SeaPAC has not carried its burden with respect to an intent on the part of the Town that the Ballpark of absolute necessity must be usable for SeaPAC's rock concerts.

Because the purchase and sale agreement between the Town and SeaPAC includes no implied term providing that both parties intended the Ballpark must be usable for rock concerts, the Town did not precipitate a failure of consideration by seeking to convey a facility in which rock concerts such as those SeaPAC produced could not be presented legally. The court properly determined as a matter of law that there was no failure of consideration on the part of the Town and that the Town was entitled to a summary judgment in its favor on SeaPAC's claims for rescission and restitution.

## II

■ In addition to entering a judgment in favor of the Town on SeaPAC's claim for rescission, the court also entered a summary judgment in favor of the Town on its counterclaim declaring that SeaPAC must continue to perform its obligation to indemnify the Town. The indemnification agreement, executed at the time of the purchase and sale agreement, obliged SeaPAC to take over the defense of certain identified claims as they may arise and to indemnify the Town against any judgments that result from those claims.[2]

The indemnification agreement identifies itself as consideration for the parties entering into the purchase and sale agreement.

2. The indemnification agreement provides in pertinent part:
 1. Buyer, jointly and severally, shall indemnify, defend and hold Seller harmless against and in respect of all claims, demands, liens, attachments, civil actions or causes of action against the Seller and/or the real estate described in Schedule A attached hereto, arising out of Seller's ownership of said real estate since July 28, 1987, which claims are more particularly identified on Schedule B attached hereto.
 2. Upon execution of this Agreement, Seller shall deliver to Buyer its records and case files with respect to the claims set forth in Schedule B attached hereto. Buyer shall assume the defense of all claims made to date and shall cause counsel of reputable standing acceptable to Seller to defend such claims. . . .

3. Within ten (10) days after receipt by Seller of written notice of the commencement of any action or the assertion of any claim described in Schedule B, Seller shall notify Buyer of the commencement or assertion thereof and give the Buyer a copy of such claim or process and all legal pleadings. Buyer shall participate in and assume the defense of such action with counsel of reputable standing acceptable to Seller. If Seller shall be required by judgment or a settlement agreement to pay any amount in respect of any obligation or liability against which Buyer has agreed to indemnify Seller under this Agreement, such amount plus all reasonable out-of-pocket expenses incurred by Seller after the date hereof in connection with such obligation or liability shall be promptly paid by Buyer.

WHEREAS, Buyer and Seller have entered into a certain Purchase and Sale Agreement dated as of April 1, 1989 with respect to the sale by Seller, and purchase by Buyer, of certain real estate located in Old Orchard Beach, Maine commonly known as "The Ballpark"; and

WHEREAS, in consideration thereof and as part of the Purchase Price thereunder, Buyer has agreed to indemnify, defend and hold Seller harmless against certain claims or demands with respect to Seller's ownership of The Ballpark;

. . . .

NOW, THEREFORE, be it agreed by Buyer and Seller as follows:

1. Buyer, jointly and severally, shall indemnify, defend and hold Seller harmless against and in respect of all claims. . . .

Neither SeaPAC nor the Town asserts any issue of fact regarding the indemnification agreement or alleges any ambiguity in the language of the indemnification agreement or in the purchase and sale agreement regarding indemnification. In reviewing the courts' granting of summary judgment in favor of the Town, therefore, we construe SeaPAC's contractual obligation to indemnify the Town as a matter of law. *Chadwick–BaRoss, Inc. v. T. Buck Constr., Inc.,* 627 A.2d at 534.

 We interpret unambiguous contract language according to its plain and commonly accepted meaning. *Brackett v. Middlesex Ins. Co.,* 486 A.2d 1188, 1190 (Me.1985). The plain language of the contract establishes that the indemnification agreement is consideration for the Town's agreement to sell the Ballpark to SeaPAC on the terms and conditions set forth in the purchase and sale agreement. The indemnification agreement is not a payment, but is an unconditional obligation that was required for entry into the purchase and sale agreement. Having undertaken the obligation not only to indemnify but to "assume the defense of all claims

made to date" and also to "participate in and assume the defense of" actions commenced thereafter, SeaPAC is not relieved of the obligations undertaken pursuant to the indemnification agreement when it chose not to complete its acquisition of the Ballpark.

The entry is:

The summary judgment in favor of the Town of Old Orchard Beach on SeaPAC's claim for rescission and the declaratory judgment in favor of the Town of Old Orchard Beach on the Town's counterclaim are affirmed.

WATHEN, C.J., and ROBERTS, GLASSMAN and DANA, JJ., concurring.

LIPEZ, Justice, with whom CLIFFORD Justice, joins, dissenting.

Although I agree with the Court's decision to affirm the judgment in favor of the town on SeaPAC's claim for rescission, I do not agree with its affirmance of the judgment in favor of the town regarding the indemnification agreement. Accordingly, I respectfully dissent.

By failing to close as required, SeaPAC breached the purchase and sale agreement with the town. That agreement provides for consequences in the event of breach by SeaPAC:

If for any reason other than those which would excuse Buyer's performance hereunder, it shall fail to extend as above provided or shall otherwise fail to complete this purchase according to its terms, *the payments made in accordance with Paragraphs 3 and 4 of this Agreement shall be forfeited as liquidated damages and neither party shall have any further rights herein.*

(emphasis added). Pursuant to this provision, the town is entitled to the exclusive remedy of the liquidated damages specified in the contract.[1] The agreement defines the

---

1. The payments that comprise the liquidated damages in case of breach are defined by paragraphs 3 and 4 of the purchase and sale agreement. Paragraph 3 provides:

 (a) The total purchase price (the "Purchase Price") for the Property shall be payable as follows: (i) Twenty–Five Thousand Dollars

($25,000) as a non-refundable Deposit to be credited to Buyer's payment pursuant to Paragraph 4(a) hereunder; and (ii) Buyer shall assume at the Time of Closing and cause Seller to be released of all Seller's obligations under that certain promissory note to Finance Authority of Maine ("FAME") in the amount of

liquidated damages as the forfeiture of the payments itemized in paragraphs 3 and 4 of the purchase and sale agreement. By its very nature, an indemnification agreement is not a payment subject to forfeiture and includable in the calculation of liquidated damages.

Although the court acknowledges that the indemnification agreement is not a payment pursuant to the purchase and sale agreement, the court avoids the implications of that conclusion by characterizing SeaPAC's duty to indemnify the town as an "unconditional obligation" that survives SeaPAC's breach. The significance of this characterization is unclear. SeaPAC's duty to indemnify is not unconditional in the sense of being independent of the purchase and sale agreement, for the very reason stated by the court: it was partial consideration for the purchase and sale agreement. As consideration, SeaPAC's indemnification obligation constitutes a performance required for fulfillment of the contract, not a "payment" to be made in lieu of performance.

The court's inclusion of the indemnification obligation in the liquidated damages remedy misses the point that liquidated damages are, *as a matter of law,* a fixed amount of money arrived at by the parties to a contract at the time of the contract.[2] The uncertainty of an ongoing obligation, defined according to the terms of the breached contract, undermines the very purpose of liquidated damages, which is to provide certainty of remedy to the nonbreaching party and certainty about the extent of liability to the breaching party.[3]

$2,200,000 dated July 28, 1987 which note bears interest at the rate of 6.75% per annum and is payable in accordance with a sixteen year amortization schedule (the "FAME Note"); all interest accruing on the FAME Note from the date hereof through the Time of Closing shall be the sole obligation of the Buyer, and Buyer hereby agrees to pay and satisfy the same.

(b) At the execution of this Agreement, Buyer shall satisfy the outstanding real estate taxes and personal property taxes in the amount of $100,500 by delivery to Seller of Buyer's Promissory Note in the principal amount thereof, principle payable in three (3) substantially equal annual installments of principal on June 30, 1989, June 30, 1990, and June 30, 1991, together with interest on the unpaid balance as of July 1, 1989 at the prime rate established from time to time by First National Bank of Boston, adjusted semi-annually, which Note shall be personally guaranteed by Dale A. Blow and Frank J. Russo. Buyer will thereupon be released by Seller of any obligations in respect of real estate taxes accruing prior to July 1, 1989.

(c) At the execution of this Agreement, Buyer shall deliver to Seller its agreement in writing, in form and content satisfactory to Seller, to indemnify, defend and hold Seller harmless from any and all claims, demands, liens, attachments, civil actions or causes of action against the Seller and/or the Real Estate arising out of Seller's ownership of the Real Estate since July 28, 1987, which claims are identified on Schedule B attached hereto.

Paragraph 4 provides in relevant part:

The closing of this Agreement shall take place at the offices of Bernstein, Shur, Sawyer and Nelson, 100 Middle Street, Portland, Maine 04101 at 10:00 o'clock a.m. on October 15, 1989; hereinafter referred to as the "Time of Closing." It is agreed that time is of the essence of this Agreement.

The Time of Closing may be extended by Buyer to the following Extended Time(s) of Closing:

a. To October 15, 1990, by payment to Seller of $150,000 prior to October 1, 1989; and

b. To October 15, 1991 by payment to Seller of $100,000 prior to October 1, 1990; and

c. To December 31, 1991 by payment to Seller of $50,000 prior to October 1, 1991.

....

... even if Buyer shall fail to extend this Agreement prior to October 1 of each year during the continuation of this Agreement, it shall nonetheless be required to make that year's extension payment.

2. A leading treatise defines liquidated damages as a "sum fixed as an estimate made by the parties at the time when the contract is entered into, of the extent of the injury which a breach of the contract will cause." 5 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 776 (3d ed.1961).

3. Pursuant to paragraph 3(a) of the purchase and sale agreement, SeaPAC paid the town $25,000 in earnest money. Although paragraph 3(a) also obligated SeaPAC to assume at closing a $2.2m FAME Note, no payments associated with the FAME Note were made because the closing never took place. Pursuant to paragraph 3(b), at the time of breach SeaPAC had paid three promissory note installments to satisfy $100,500 in certain past taxes on the Ballpark plus interest.

Paragraph 4 of the purchase and sale agreement identifies annual payments to be made to the town for the right to extend the date of closing. At the time of breach, SeaPAC had tendered letters of credit and promissory notes

In effect, the court's approach results in an award of specific performance to the Town under the guise of liquidated damages. Such an approach reflects a misapprehension of applicable legal principles.

For the foregoing reasons, I would vacate the court's grant of a summary judgment in favor of the town on its counterclaim seeking a declaration that SeaPAC has a continuing duty to indemnify the town.

fulfilling all but the third installment payment of $50,000.

Thus at the time of its breach of the purchase and sale agreement, it appears from the record that SeaPAC's "payments made in accordance with Paragraphs 3 and 4" included the $25,000 earnest money deposit, $100,500 in tax obligations, and $250,000 in extension payments.