Hanya KANDLIS

v.

Robert A. HUOTARI et al.[1]

and

Leo S. Deegan et al.

Supreme Judicial Court of Maine.

Argued March 7, 1996.

Decided June 18, 1996.

---

1. This case was initially captioned *Oxford Bank and Trust v. Edward K. Keiser et al.* Oxford settled all of its claims and Edward and Terry Keiser filed a petition in the bankruptcy court. The caption has been changed to reflect the remaining parties in this action.

**42**

Martin I. Eisenstein (orally), Roy T. Pierce, Brann & Isaacson, Lewiston, for Plaintiff.

Barry E. Schklair (orally), Portland, Thomas M. Closson (orally), Daniel P. Schwarz, Sheehan, Phinney, Bass & Green, P.A., Portsmouth, NH, for Defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

DANA, Justice.

Hanya Kandlis appeals from a summary judgment entered in the Superior Court (Oxford County, *Perkins, A.R.J.*) in favor of Carol and Robert Huotari, Dorothy and Edward Luck, Shelly and Robert Cross, and Leo Deegan on Kandlis's claim for contribution. Kandlis argues that the court erred in holding that she had either expressly or impliedly waived her right to contribution. We agree and vacate the judgment.

In 1987 Keiser Homes of Maine, Inc., sought financing from Oxford Bank and Trust. As a condition of the loan Oxford required that all the shareholders of Keiser and their spouses sign identical personal guaranties for the full amount of the loan. By 1990 Oxford had loaned $2,266,000 to Keiser, all backed by the guaranties and a mortgage on Keiser's manufacturing facility. When Keiser defaulted on its obligation the manufacturing facility was sold at auction for approximately $1,250,000, leaving a deficiency in the amount of $1,122,571.

Oxford brought several actions seeking judgments against Kandlis and the other guarantors. Kandlis paid Oxford $375,000. The amount collected by Oxford from all the guarantors totaled $1,152,000 and represented full satisfaction of the amount due plus interest.[2] Thereafter Kandlis filed a cross complaint for contribution against Edward and Terry Keiser and the Huotaris, and a third-party complaint for contribution against Leo and Christina Deegan, the Lucks, the Crosses, and George and Frances Bumila. George Bumila brought his own contribution action against the Huotaris, the Deegans, the Lucks, and the Crosses. The court dismissed any claims against Christina Deegan for lack of personal jurisdiction. The Huotaris filed a motion for a summary judgment against the Kandlis and Bumila claims. Leo Deegan, the Lucks, and the Crosses subsequently joined in the Huotaris' motion. The court granted all pending motions, thus disposing of all claims against Leo Deegan, the Huotaris, the Lucks, and the Crosses.[3] Kandlis now appeals.

█ in reviewing a grant of a summary judgment we view the evidence in the light most favorable to the party against whom the judgment has been granted, and review the trial court's decision for errors of law. *Casco N. Bank v. Estate of Grosse*, 657 A.2d 778, 780 (Me.1995). We independently determine whether the record supports the conclusion that there is no genuine issue of material fact and that the prevailing party is entitled to a judgment as a matter of law. *Id.*

### I.  *Express Waiver*

█ The defendants first contend that all of the notes and guaranties signed by the guarantors constitute a single integrated agreement with Oxford, and that there is express language in the guaranties waiving any right of contribution among and between them. Generally, the right to contribution

---

2. The guarantors paid the following amounts:

| | |
|---|---|
| Kandlis | $375,000 |
| Huotaris | $150,000 |
| Crosses and Lucks | $350,000 |
| Bumilas | $250,000 |
| Deegans | $ 27,000 |
| Keisers | $      0 |

3. Although Kandlis's claim against George and Frances Bumila remains, the court, pursuant to M.R.Civ.P. 54(b)(1), ordered the entry of a final judgment in favor of the summary judgment movants.

can be destroyed only by an agreement between the obligated parties. *United States v. Immordino,* 534 F.2d 1378, 1382 (10th Cir.1976) (citing 18 Am.Jur.2d *Contribution* §§ 6, 32 (1965)). Therefore, even if the relevant guaranty language contains an express waiver of the guarantors' rights to contribution, the waiver is enforceable by one guarantor against another only if the separate guaranties can be read together as a single contract.

The general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one contract or instrument.

17A Am.Jur.2d *Contracts* § 388 (1991). *See also Rosenthal v. Means,* 388 A.2d 113, 115 (Me.1978) (all writings that form part of or pertain to the same transaction should be read together); *Alden v. Camden Anchor–Rockland Mach. Co.,* 107 Me. 508, 510, 78 A. 977 (1911) ("[d]ifferent instruments are to be construed together as parts of the same contract where necessary to carry into effect the agreement and intention of the parties"). There is ample evidence in the record to support the position that all of the guaranties should be read together as part of the same transaction. Oxford's decision to lend money was premised on all of the shareholders and their spouses signing guaranties. In her affidavit Kandlis acknowledges that all of the Keiser shareholders signed identical guaranties, for the same purpose, and that they all knew what they were signing. All of the guaranties were signed by the respective guarantors within a two week period. Finally, the use of the phrase "jointly and severally" suggests the parties intended that the guaranties be considered as one agreement. *See George C. Hall & Sons, Inc. v. Taylor,* 628 A.2d 1037, 1039 (Me.1993) (joint and several liability can result when two or more parties are liable pursuant to a single contract); *see also Banville v. Huckins,* 407 A.2d 294, 297 (Me.1979) (citing *Don L. Tullis & Assoc., Inc. v. Gover,* 577 S.W.2d 891, 900 (Mo.App.1979), for the proposition that

where two or more persons undertake the performance of an obligation the presumption is that the undertaking is joint, words of express joinder not being necessary, but words of severance being required to produce several responsibility). Thus we are satisfied that if the guaranties contain an express waiver of contribution it is enforceable among and between the guarantors.

■ Although it did not directly rule on the defendants' express waiver argument, the trial court did find that "the relevant language of the Guaranty documents at issue is not ambiguous as a matter of law." A guaranty is a contract and is governed by the same rules of construction as other contracts. *Rosenthal,* 388 A.2d at 114; *see also Gillighan v. Boardman,* 29 Me. 79, 81 (1848) (a contract of guaranty must receive such a construction as will carry into effect the intentions of the parties). Whether the language of a contract is ambiguous is a question of law that we review *de novo. Tondreau v. Sherwin–Williams Co.,* 638 A.2d 728, 730 (Me.1994). If the contract language is ambiguous or uncertain its interpretation is a question of fact to be determined by a factfinder. *Id.* Contract language is ambiguous when it is reasonably susceptible to different interpretations. *Fitzgerald v. Gamester,* 658 A.2d 1065, 1069 (Me.1995). We find that the contract language is ambiguous and therefore its meaning should not have been determined by the trial court on a motion for a summary judgment.

The relevant guaranty language states:

The Undersigned hereby waives any right to exoneration by the Borrower, or to contribution from any co-surety or security for any of the Obligations, defers any right of subrogation until all Obligations of the Borrower to the Bank, whether or not guaranteed by the Undersigned hereunder, are paid in full, and defers and fully subordinates to the Obligations any right to reimbursement from the Borrower, until all Obligations of the Borrower are paid in full.

The above-quoted language is a single sentence, set-off only by commas. The contribu-

tion waiver language is in the first of three clauses within the sentence. That first clause speaks only in general and presumably absolute terms. It could be interpreted to be, as the defendants argue, an express waiver of the co-guarantors' contribution rights. The sentence, however, ends by referring to a time when Oxford is finally paid in full, suggesting that the contribution waiver was meant to be only temporary, until such time as the Keiser debt is satisfied. Because the language is reasonably susceptible to different interpretations a summary judgment is not appropriate on the basis that Kandlis expressly waived her right to contribution.

## II. *Implied Waiver*

■ The court rested its grant of a summary judgment squarely on the rationale of *Immordino*, 534 F.2d at 1378, in which the Small Business Administration accepted approximately $7,000 in satisfaction of the obligations of six co-guarantors, and brought suit to recover the balance owed, $40,000, from the Immordinos. The Immordinos filed a third-party complaint for contribution against the six co-guarantors, who argued that the Immordinos' acquiescence in their release by the SBA eliminated the Immordinos right to contribution. *Id.* at 1382. The court, recognizing the general principle that "the right to contribution can be destroyed only by an agreement between the obligated parties themselves," framed the issue as whether "in an agreement with a creditor, a guarantor may by implication waive his implied-in-law right to contribution." *Id.* The court regarded the Immordinos' grant to the SBA of the power to settle with other guarantors without it affecting their own obligation as granting the SBA the power to "pick its victim." *Id.* The court stated that the right to contribution, however, was intended to *prevent* a creditor from picking its victim. *Id.* To effectuate the SBA's right to pick its victim the court found an implied waiver of the right to contribution. *Id.*

The defendants argue that the guaranty at issue in this case is similar to the one in *Immordino* in that the guarantors, by granting Oxford the right to release co-guarantors without that affecting any other guarantor, granted Oxford the power to pick its victim. The defendants contend that the rationale for the implied waiver is to allow the creditor maximum flexibility in its collection efforts. They argue that this flexibility is maintained by allowing Oxford the ability to offer each settling guarantor a full release from all future claims by either itself or a co-guarantor who might otherwise seek contribution.

The relevant guaranty language states:

> The liability of any of the Undersigned shall not be terminated or otherwise affected or impaired by Bank's granting time or other indulgence to Borrower, or by Bank's heretofore, now, or hereafter acquiring, releasing or in any way modifying any guaranty from any other person or persons. . . .

We agree with the defendants that the quoted language does allow Oxford to "pick its victim." Oxford is given the power, as the result of a contract it required as a condition of loaning money, to seek payment from whichever of the guarantors, and in whatever amount, it sees fit, i.e., to pick its victim. That recognition, however, is not the end of our inquiry.

The *Immordino* result arguably puts the interests of the creditor above any other interest. The *Immordino* court was concerned with maintaining the creditor's bargained-for ability to pick its victim. To do this it cut off the guarantor's ability to seek contribution. The argument in support of such a result is that guarantors, knowing they will not be sued later on for contribution, will be more willing to settle. This theory, however, only works if the guarantor in question is going to settle for less than what her pro-rata share would otherwise be. On the other hand, guarantors from whom the creditor seeks more than their pro-rata share will have every incentive to stall or fight settlement, knowing that they will not be able to seek contribution later. Thus the argument could just as easily be made that contribution *helps* creditors because it allows the guarantor with greater resources to settle for more than its pro-rata share, safe in the knowledge that it can then seek contribution from its co-guarantors.

We find the case of *First Am. Bank of New York v. Fallova Shredder Co.*, 155 Misc.2d 143, 587 N.Y.S.2d 119 (N.Y.Sup.Ct. 1992), persuasive. In *First Am.* a guarantor sought contribution from a co-guarantor for the amount over the guarantor's pro-rata share that he had already paid to the creditor. *Id.* 587 N.Y.S.2d at 120. The co-guarantor argued that a provision in the guaranty released him from any liability to any other guarantor once he obtained a release from the creditor. *Id.* Failing to find any New York precedent on the issue, the court based its decision on "policy considerations," saying:

> The contract language concerning continuing liability by the guarantor even though the lending institution releases the principal and co-guarantors is designed to protect the lending institution. It was not inserted by the lending institution to protect co-guarantors the bank might choose not to sue from claims for contribution by co-guarantors paying more than their pro rata share. Certainly, most individuals signing personal guarantees in order to obtain bank funds for corporations do not contemplate that the language allowing them to remain liable if the lending institution chooses not to pursue co-guarantors would also serve to extinguish his or her claim against the co-guarantors.

*Id.* This reasoning is supported by the underlying theory of contribution as being "based, not upon the instrument on which the guarantors have become liable, but upon the theory that when they signed such instrument, they impliedly agreed that if there should be any liability, each would contribute his just proportion of the amount for which they might be held liable." 38 Am.Jur.2d *Guaranty* § 128 (1968). Additionally, the rationale of *First Am.* gives weight to the general rule that the right to contribution can be destroyed only by an agreement between the *obligated* parties. Given the practical reality that most lenders require clauses that provide that "the release of a principal or co-guarantor does not release any remaining guarantor," *First Am.*, 587 N.Y.S.2d at 120, adoption of the *Immordino* rationale would effectively destroy the right of contribution among co-guarantors, implying a waiver in every instance.

■ The right to contribution originated in equity and eventually took the form of an implied contract, so, in the absence of an express agreement, contribution is enforceable on a theory of a contract implied in law or in fact. 19 Am.Jur.2d *Contribution* §§ 5, 7 (1985). The co-guarantors in this case jointly and severally guarantied the debt. They could have limited their exposure vis-a-vis the guaranties by bargaining for such a limit, either with the creditor or with their co-guarantors. One incentive for a co-guarantor to so bargain might be an increase in that guarantors share of the profit, should the venture succeed. Assuming, without deciding, that the guaranties at issue do not contain express waivers of the guarantors' rights to contribution, none of the parties to this action limited their contribution liability and we find for the reasons stated that it would be inappropriate to judicially limit it by implication.[4]

The entry is:

Judgment vacated. Remanded for further proceedings consistent with the opinion herein.

All concurring.

---

4. In her brief appellee Carol Huotari argues that equity does not support apportioning liability to her as a non-shareholder spouse. Because Huotari did not argue this point to the trial court and because it is an issue requiring a factfinder to determine the relative equities of all of the parties we decline to address it for the first time on appeal.