1999  ME  79

**John P. SPOTTISWOODE et al.**

v.

**Timothy LEVINE et al.**

Supreme Judicial Court of Maine.

Argued April 6, 1999.
Decided May 25, 1999.

168

Peter Clifford (orally), Kennebunk, for plaintiffs.

John S. Campbell (orally), Campbell & McArdle, P.A., Portland, for defendants.

Before WATHEN, C.J., and RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Timothy and Maureen Levine ("Mr. and Mrs. Levine") appeal from the judgment entered in the Superior Court (York County, *Fritzsche, J.*) in favor of John and Terry Spottiswoode ("Mr. and

Mrs. Spottiswoode"), holding the Levines liable for contribution as co-guarantors of the debt of R.B.K. Caly Corporation ("RBK"). The Levines contend that the court erroneously: (1) concluded that Mrs. Levine was liable for contribution, despite her allegation that her guaranty violated the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f (1994); and (2) applied a "pro rata" standard in allocating the liability of the co-guarantors, thereby rendering them liable for one-third of the debt. By way of cross-appeal, RBK contends that the court erroneously concluded that Mr. Levine did not violate the Uniform Trade Secrets Act ("UTSA"), 10 M.R.S.A. §§ 1541–1548 (1997). We affirm the judgment entered on the Spottiswoode's claim for contribution and the judgment entered on RBK's UTSA counterclaim.

[¶ 2]   In the spring of 1993, Mr. Spottiswoode and Mr. Levine formed RBK to undertake commercial construction projects. Mr. Spottiswoode had been successful in the residential construction business and wanted to enter into commercial construction. Mr. Levine had substantial experience in commercial construction, but fewer assets than Mr. Spottiswoode. Although the parties hoped the venture would prove to be quite profitable, RBK later became insolvent and failed.

[¶ 3]   Mr. and Mrs. Spottiswoode and Mr. Levine served as directors of RBK; Mr. Spottiswoode and Mr. Levine also served as president and vice-president, respectively. Mr. Spottiswoode, Mr. Levine, and RBK entered into a number of agreements, including an employment agreement for Mr. Levine and a stock purchase agreement. The employment agreement provided that Mr. Levine would receive, *inter alia,* the following compensation for his services: (1) $85,000 salary per year; (2) disability insurance at RBK's expense; and (3) twenty-five percent of RBK's pretax net income, as bonus compensation.

The stock purchase agreement provided that: (1) Mr. Spottiswoode would initially obtain 499 shares of stock, and Mr. Levine would obtain one share; (2) Mr. Levine had the right to purchase up to 248 additional shares from Mr. Spottiswoode for $1,000 per share; and (3) Mr. Levine must use any bonus compensation that RBK paid him to exercise his right to purchase shares from Mr. Spottiswoode, until he had purchased all 248 additional shares.

[¶ 4]   The general structure of the venture involved Mr. Spottiswoode providing financial support for RBK and Mr. Levine providing specialized expertise. To finance the venture, Mr. Spottiswoode put up a substantial amount of his own assets, and RBK borrowed additional funds on its own. Mr. Spottiswoode funded the corporation in part by utilizing an existing line of credit with Ocean National Bank ("the Bank"), part of which the Bank loaned to RBK as working capital. A central dispute in this case involves the $300,000 commercial line of credit that the Bank extended to RBK. Six co-guarantors guarantied the repayment of loans made under the credit line: (1) Mr. Spottiswoode; (2) Mrs. Spottiswoode; (3) Mr. Levine; (4) Mrs. Levine; (5) Down–East Construction & Development Corporation ("Down–East"); and (6) Lake Brook Co. ("Lake Brook").[1] After the business failed, the Spottiswoodes repaid the approximately $300,000 that the Bank had loaned to RBK, and then sought a one-half contribution from the Levines.

[¶ 5]   When Mr. Spottiswoode initially arranged for the Bank to provide RBK with a line of credit, the Bank and Mr. Spottiswoode asked Mr. Levine to co-sign the guaranty, as well as a commitment letter that confirmed the Bank's approval of the $300,000 credit line and enumerated "further conditions to the loan." The commitment letter stated that the line of credit would be effective through May 14, 1994, and required that all guarantors provide

---

1.  Mr. Spottiswoode signed all pertinent documents on behalf of Down–East and Lake Brook in his capacity as president of both companies.

the Bank with updated financial information and tax returns before the Bank would consider renewing the credit line. The Spottiswoodes and Levines signed the first commitment letter, and then signed the guaranty within eleven days.[2]

[¶ 6] In May 1994, the Bank considered extending the line of credit to RBK for a second year, and issued a renewal commitment letter to RBK extending the Bank's commitment on the $300,000 credit line for another year. Similarly to the first commitment letter, the second letter indicated that: (1) the Bank was committed to providing the line of credit for one year; (2) all guarantors would have to resubmit financial information before the Bank would consider renewal for the following year; and (3) all guarantors must sign the commitment letter. Mr. and Mrs. Levine both signed the renewal commitment letter on June 2, 1994, and the four other co-guarantors signed the letter on June 6, 1994.

[¶ 7] In May 1995, the Bank sent a third commitment letter to Mr. Levine and Mr. Spottiswoode, requesting that they submit updated tax returns, personal financial statements, and corporate financial information. The Spottiswoodes complied with the Bank's request, but the Levines refused to submit any information or sign another commitment letter. In June 1995, Mr. Levine's position with RBK terminated. That same month, the Levines also refused to sign a document asking for their signatures on an allonge to extend the time for repayment on the loan until August 15, 1995.

[¶ 8] On June 30, 1995, Mr. Spottiswoode alone signed an allonge to extend repayment on the loan until August 15, 1995. The Bank extended repayment again in August and November 1995, after obtaining only Mr. Spottiswoode's signature. When the Bank called the loan, Mr. Spottiswoode satisfied the debt, which had increased from $152,000 (the amount outstanding on the loan at the time of Levine's termination) to approximately $300,000.

[¶ 9] Another dispute in this case involves a computer system, which Mr. Levine used while working for RBK. RBK paid $5,000 to computer programmer Myron Curtis for the right to use the software, at least part of which Curtis had licensed from another vender. Mr. Levine and Curtis worked together to some degree on the program to adapt it for RBK's use in making bids on construction projects. After Mr. Levine's termination from RBK, he obtained employment at Cianbro Corporation ("Cianbro"). He asked Cianbro to purchase the right to use the computer system from Curtis. Cianbro paid Curtis $5,000 for the software, which apparently proved to be of little benefit to Cianbro.

[¶ 10] The Spottiswoodes brought a suit for contribution against the Levines, asking the court to order the Levines to pay one-half of the Bank's loan to RBK, which the Levines had guarantied. In response, the Levines filed: (1) an answer and a two-part counterclaim against the Spottiswoodes, disputing their liability for contribution; (2) a third-party complaint against Down–East and Lake Brook for contribution; and (3) a third-party complaint against RBK for indemnification. RBK counterclaimed, alleging that Mr. Levine obtained, purchased, and developed a computer system containing trade secrets, which he misappropriated in violation of the UTSA.

[¶ 11] After a bench trial, the court concluded that: (1) no violation of the ECOA occurred; (2) the Levines were each liable for contribution for one-sixth of RBK's debt arising from the line of credit; and (3) the Spottiswoodes failed to prove that Mr. Levine had violated the UTSA. Thereafter, the court denied the parties'

---

**2.** The Spottiswoodes, Mr. Levine, Down–East, and Lake Brook signed the first commitment letter on May 14, 1993. Mrs. Levine signed the commitment letter on May 18, 1993. All six co-guarantors signed the guaranty on May 25, 1993.

motions to reconsider and/or enter further findings of fact, although the court found that the parties received equal benefit and should be equally liable for contribution. This appeal ensued.

### I.   Equal Credit Opportunity Act

[¶ 12]   The Levines argue that the Spottiswoodes were independently credit-worthy, and that the Bank therefore violated the ECOA by requiring Mrs. Levine's signature on a credit instrument.[3]  They contend that: (1) Mrs. Levine could assert the alleged ECOA violation directly against the Spottiswoodes as a defense to their action for equitable contribution; and (2) the alleged ECOA violation voided her guaranty to the Bank, thereby extinguishing the common liability that was the basis of the Spottiswoodes' contribution claim. We disagree.

[¶ 13]   Neither party has cited a case upholding a claim or defense against a co-guarantor based on an alleged ECOA violation.  "Section 1691 limits the remedies provided thereunder to 'creditors.'" *Hammons v. Ehney*, 924 S.W.2d 843, 852 (Mo.1996).  "The term 'creditor' means any person who regularly extends, renews, or continues credit; any person who regu-larly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit."  15 U.S.C. § 1691a(e).  The Levines have failed to show that either Mr. or Mrs. Spottiswoode: (1) "regularly extends, renews, or continues credit"; (2) "regularly arranges for the extension, renewal, or continuation of credit"; or (3) are an "assignee of an original creditor who participates in the decision to extend, renew, or continue credit."  15 U.S.C. § 1691a(e).  Therefore, the Spottiswoodes are not "creditors" within the meaning of the ECOA, and the Levines cannot assert an alleged violation of the act against them directly as a defense to an equitable contribution action.  *See Hammons*, 924 S.W.2d at 852.  Further, to the extent that the Spottiswoodes were innocent co-guaran-tors who had no control over the actions of the Bank, little purpose would exist for penalizing them.  *See id.*

[¶ 14]   Even if the Bank had violated the ECOA, Mrs. Levine would not escape liability for contribution.  "The vast majority of cases considering relief available for violation of the ECOA have held

---

3.  The ECOA provides that it is "unlawful for any creditor to discriminate against any appli-cant, with respect to any aspect of a credit transaction ... on the basis of ... marital status ...." 15 U.S.C. § 1691(a) (1994).  Sec-tion 1691b of the ECOA grants the Board of Governors of the Federal Reserve System ("Board") the authority to "prescribe regula-tions to carry out the purposes of this sub-chapter." 15 U.S.C. § 1691b (1994).  Pursu-ant to that authority, the Board promulgated Regulation B. *See* 12 C.F.R. § 202.1(a) (1999).  Regulation B states, in pertinent part:  "a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. § 202.7(d)(1) (1999).  Regulation B also pro-vides:

If, under a creditor's standards of credit-worthiness, the personal liability of an addi-tional party is necessary to support the ex-tension of the credit requested, a creditor may request a cosigner, guarantor or the like.  The applicant's spouse may serve as an additional party, but the creditor shall not require that the spouse be the addition-al party.

12 C.F.R. § 202.7(d)(5).

As a specific remedy for violations of the act, the ECOA authorizes a federal civil action against the creditor for damages, punitive damages, and attorney fees.  *See* 15 U.S.C. §§ 1691e(a), (b), (d) (1994).  The ECOA also authorizes a court to issue "equitable and declaratory relief as necessary" to enforce the requirements of the act.  15 U.S.C. § 1691e(c) (1994).  "Many cases have utilized [section 1691e(c) ] as authority for allowing a debtor to assert violations of the ECOA as a counterclaim for recoupment or as an affir-mative defense to collection actions, even af-ter the running of the two[-]year statute of limitations."  *Hammons v. Ehney*, 924 S.W.2d 843, 852 (Mo.1996).  However, such cases "dealt with claims made against the actual lenders or those standing in the lenders' shoes."  *Id.*

that there is no authority in the statutory language for the proposition that a violation of the ECOA renders an instrument void." *Id.* "The reasoning of these cases is that where such drastic relief is not expressly stated in the statute, it will not be implied." *Id.* Therefore, an alleged ECOA violation by the Bank would not render the guaranty void or extinguish Mrs. Levine's liability for equitable contribution to co-guarantors.

## II. Guaranty

[¶ 15] The Levines contend that the court erroneously: (1) concluded that the Spottiswoodes were entitled to demand contribution from them each for a one-sixth share of the debt they guarantied; and (2) denied their Rule 52(a) motion for further factual findings as to the expiration of their guaranty. We disagree.

[¶ 16] We review issues of law *de novo* and issues of fact for clear error. *See State v. O'Connor,* 681 A.2d 475, 476 (Me.1996); *White v. Zela,* 1997 ME 8, ¶ 3, 687 A.2d 645, 646. "A guaranty is a contract and is governed by the same rules of construction as other contracts." *Kandlis v. Huotari,* 678 A.2d 41, 43 (Me.1996). "Whether the language of a contract is ambiguous is a question of law that we review *de novo.*" *Id.* "If the contract language is ambiguous or uncertain[,] its interpretation is a question of fact to be determined by a factfinder." *Id.* "Contract language is ambiguous when it is reasonably susceptible to different interpretations." *Id.* The intent of the parties in entering a contract is a question of fact that we review for clear error. *See Seashore Performing Arts Ctr., Inc. v. Town of Old Orchard Beach,* 676 A.2d 482, 484 (Me.1996). However, the interpretation of an unambiguous contract is a question of law that we review *de novo. See Town of Lisbon v. Thayer Corp.,* 675 A.2d 514, 516 (Me.1996).

### A. Contribution

[¶ 17] As a general rule, co-guarantors must bear, among themselves, a ratable proportion of the amount for which they are liable under the contract of guaranty. *See, e.g., Hammons,* 924 S.W.2d at 853. A co-guarantor who has paid more than its share is entitled to demand contribution from each of the others for an aliquot part of the entire debt, and to maintain suit to enforce the right to contribution. *See, e.g., Steele v. Grot,* 232 Ga.App. 847, 503 S.E.2d 92, 93 (1998) ("[t]he right of contribution arises not when the joint obligation is made but when one obligor pays more than his share of the liability"); *W. Coach Corp. v. Roscoe,* 133 Ariz. 147, 650 P.2d 449, 454 (1982). However, the guarantors are free to determine, by the terms of their contract, the proportion each shall bear. *See Kandlis,* 678 A.2d at 42–43.

[¶ 18] "The right to contribution originated in equity and eventually took the form of an implied contract, so, in the absence of an express agreement, contribution is enforceable on a theory of a contract implied in law or in fact." *Id.* at 45. "[T]he underlying theory of contribution [is] 'based, not upon the instrument on which the guarantors have become liable, but upon the theory that when they signed such instrument, they impliedly agreed that if there should be any liability, each would contribute his just proportion of the amount for which they might be held liable.'" *Id.* (quoting 38 AM. JUR. 2D *Guaranty* § 128 (1968)).

[¶ 19] Absent proof to the contrary, the law presumes that each co-guarantor received equal benefit from the guaranty and must contribute equally in discharging the common obligation. *See, e.g. Steele,* 503 S.E.2d at 93. However, "[t]he presumption that each co-obligor benefitted in an equal degree is subject to rebuttal by proof that there was an inequality of benefits received." *Id.* "[S]ince the right to contribution is inherently equi-

table in nature, the rule logically follows that where co-obligors have received unequal benefits from the common obligation, the portion of the contribution that each must bear is according to the benefit that each has received." *Id.* (quoting 18 Am. Jur. 2d *Contribution* § 23 (1985)).

[¶ 20] The trial court concluded that the Levines had failed to rebut the presumption that the co-guarantors received equal benefit from their common obligation. As the court noted, the Levines received benefit that included "a good salary and ... a potential for even greater earnings." Although the stock purchase agreement only provided Mr. Levine with one share of stock initially, he had an opportunity to accumulate 249 out of 500 shares. In addition to the $300,000 line of credit to RBK that the Levines guarantied, the Spottiswoodes also infused $500,000 of capital into RBK, which the Levines did not guaranty. The court did not err when it concluded that the Levines received equal benefit in consideration for their guaranties. The court's equitable remedy was appropriate under the circumstances.

### B. Rule 52(a)

[¶ 21] The Levines contend that the guaranty and commitment letters were ambiguous, when read together, and that the trial court erroneously failed to make factual findings clarifying the ambiguity.[4] We disagree.

[¶ 22] Rule 52(a) provides that the court "shall, upon the request of a party made as a motion ... find the facts specially." M.R. Civ. P. 52(a). However, when the court files an opinion or memorandum of decision "it [is] sufficient if the findings of fact and conclusions of law appear therein." *Id.* "[T]he failure of the trial justice clearly to state the factual findings and correlate them with the relevant legal conclusions both hinders effective appellate review and fails to inform either the parties or the appellate court of the reasoning underlying the conclusions." *Murray v. Murray,* 529 A.2d 1366, 1368 (Me. 1987).

[¶ 23] "Generally, the right to contribution can be destroyed only by an agreement between the obligated parties." *Kandlis,* 678 A.2d at 42–43. Since the guaranty and commitment letters were "executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction," we consider and construe them together as one contract or instrument. *Id.* at 43 (quotations omitted).

[¶ 24] The guaranty and commitment letters are unambiguous, when read together. *See id.* By their plain language, the guaranty and commitment letters do not limit the Levines' contribution liability, despite the Levines' unilateral refusal to comply with the Bank's third request for updated financial information. Although the commitment letters required the guarantors to submit financial information for "renewal consideration," this requirement simply protected the Bank and did not limit the Levines' liability under the broad terms of the guaranty, which the Levines each signed. As the trial court found, the Levines failed to expressly limit their liability for contribution, although they were sophisticated enough to do so. It would be inappropriate to judicially limit their contribution liability by implication. *See id.* at 45. The Levines did not escape liability by refusing to submit information or sign additional documents necessary to extend or renew the loan because, in their

---

4. The Levines claim that the trial court erroneously failed to make factual findings as to the expiration of their guaranty. They contend that Mr. Spottiswoode assumed sole liability on the note and discharged them as guarantors when he renewed the line of credit commitment without their authorization. The Levines also argue that, "[e]ven if there was no total discharge, Mr. Spottiswoode's actions should have estopped him from seeking recovery of sums advanced after the line expired."

guaranty, they explicitly waived indulgences that the Bank extended to RBK.

■ [¶ 25] The trial court properly exercised its discretion by declining to issue further findings of fact as to the expiration of the Levines' contribution liability. *See Bell v. Bell,* 1997 ME 154, ¶ 6, 697 A.2d 835, 837. The record contained copies of the unambiguous guaranty and commitment letters. Since the interpretation of an unambiguous contract is a question of law that we review *de novo,* no further findings of fact were necessary for appellate review. *See Thayer Corp.,* 675 A.2d at 516.

### III. Uniform Trade Secrets Act

[¶ 26] On cross-appeal, RBK argues that the court's analysis of the UTSA claim "contained numerous errors of law," and

that the court ignored the pertinent statutory language and applied the wrong legal standards to the facts.

■ [¶ 27] In its counterclaim, RBK seeks injunctive relief and damages for Mr. Levine's alleged misappropriation of a trade secret. *See* 10 M.R.S.A. §§ 1543, 1544. As an initial matter, a court examining a claim under the UTSA must determine whether the information at issue constitutes a "trade secret," as that term is defined in 10 M.R.S.A. § 1542(4).[5] *See Northeast Coating Techs., Inc. v. Vacuum Metallurgical Co.,* 684 A.2d 1322, 1324 (Me.1996). In order for information to qualify as a trade secret, the information must: (1) derive "independent economic value, actual or potential, from not being generally known [or] readily ascertainable";[6] and (2) be "the subject

---

**5.** 10 M.R.S.A. § 1542 (1997) provides:
  **§ 1542. Definitions**
  As used in this Act, unless the context otherwise indicates, the following terms have the following meanings.
  **1. Improper means.** "Improper means" means theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy or espionage through electronic or other means.
  **2. Misappropriation.** "Misappropriation" means:
  **A.** Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
  **B.** Disclosure or use of a trade secret of another without express or implied consent by a person who:
  **(1)** Used improper means to acquire knowledge of the trade secret;
  **(2)** At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
  **(i)** Derived from or through a person who had utilized improper means to acquire it;
  **(ii)** Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
  **(iii)** Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
  **(3)** Before a material change of his position, knew or had reason to know that it

was a trade secret and that knowledge of it had been acquired by accident or mistake.
  . . . .
  **4. Trade secret.** "Trade secret" means information, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that:
  **A.** Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
  **B.** Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**6.** Some factors a court may examine to determine whether the information "[d]erives independent economic value . . . from not being generally known (or) readily ascertainable," 10 M.R.S.A. § 1542(4)(A), include: (1) the value of the information to the plaintiff and to its competitors; (2) the amount of effort or money the plaintiff expended in developing the information; (3) the extent of measures the plaintiff took to guard the secrecy of the information; (4) the ease or difficulty with which others could properly acquire or duplicate the information; and (5) the degree to which third parties have placed the information in the public domain or rendered the information "readily ascertainable" through patent applications or unrestricted product marketing. *See, e.g., Moore v.. Marty Gilman,*

of efforts that are reasonable under the circumstances to maintain its secrecy." [7] 10 M.R.S.A. § 1542(4); *Northeast Coating Techs., Inc.*, 684 A.2d at 1324.

[¶ 28] Even if the computer program qualified as a trade secret. RBK could not recover damages or obtain injunctive relief under the UTSA without establishing "misappropriation." *See* 10 M.R.S.A. § 1544. The term "misappropriation" means, *inter alia:* "[d]isclosure or use of a trade secret of another without express or implied consent by a person who ... [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was ... [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use...." 10 M.R.S.A. § 1542(2)(B).

[¶ 29] Thus, RBK bore the burden of establishing that the information at issue constituted a "trade secret" and that Levine "misappropriated" the protected information. The trial court found that RBK failed to sustain its burden. We are not compelled to find otherwise.

The entry is:

Judgment affirmed.

---

*Inc.*, 965 F.Supp. 203, 217 (D.Mass.1997); *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 282 N.E.2d 921, 925 (1972); *Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*, 931 F.Supp. 18, 23 (D.Mass.1995).

7. Some factors a court may examine to determine whether the information "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy," 10 M.R.S.A. § 1542(4)(B), include: (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which employees and others involved in the plaintiff's business know the information; (3) the nature and extent of measures the plaintiff took to guard the secrecy of the information; (4) the existence or absence of an express agreement restricting disclosure; and (5) the circumstances under which the information was disclosed to any employee, to the extent that the circumstances give rise to a reasonable inference that further disclosure without the plaintiff's consent is prohibited. *See, e.g., Moore*, 965 F.Supp. at 217; *Jet Spray Cooler, Inc.*, 282 N.E.2d at 925; *Picker Int'l Corp.*, 931 F.Supp. at 23.