STATE OF MAINE
CUMBERLAND, ss.

STATE OF MAINE
CUMBERLAND, SS
CLERK'S OFFICE

2005 APR 22 A 8: 46

SUPERIOR COURT
CIVIL ACTION
DOCKET Nos. (Consolidated)
CV-02-365 and CV-03-249[1]

MORSE BROS. INC., ET AL,

Plaintiffs

v.

DESMOND & PAYNE, INC.,

Defendant

and

MORSE BROS. INC., ET AL,

Plaintiffs

v.

ONE BEACON INSURANCE COMPANY,

Defendant

DECISION AND ORDER

These consolidated matters were tried before the court on (a) the plaintiffs'

complaint in CV-02-365 against the defendant Desmond & Payne, Inc.,

("Desmond") alleging breach of contract (Count I), malpractice/negligence (Count

II) negligent misrepresentation (Count III), and breach of fiduciary duty (Count

IV); (b) the plaintiffs' complaint in CV-03-429 against the defendant One Beacon

---

[1] On July 22, 2003, Cumberland Cty. Super. Ct. Doc. No. CV-02-365 *Morse Bros, Inc., v. Desmond & Payne, Inc.*, was consolidated with Androscoggin Cty. Super Ct Doc. No. CV-03-68 *Morse Bros, Inc. v. OneBeacon Ins. Co.* As a result of the consolidation, the Androscoggin case was assigned Cumberland Cty. Super Ct. Doc. No. CV-03-429.

1

Insurance Company ("One Beacon") alleging breach of contract (Count I), wrongful termination of insurance contract (Count II), and vicarious liability (Count III); and (c) the counterclaim of One Beacon in CV-03-429 against the plaintiffs for rescission of the insurance contract.

At the conclusion of the trial, the defendants each moved for judgment as a matter of law. M.R. Civ. P. 50(d). In CV-02-365, Desmond's motion was granted as to Count II alleging malpractice/negligence. In CV-03-429, OneBeacon's motion was granted as to all counts of the complaint and, as a consequence, the court found for the plaintiffs on OneBeacon's counterclaim for rescission.

Accordingly, this decision is directed to the remaining claims by the plaintiffs against Desmond in CV-02-365 for breach of contract (Count I), negligent misrepresentation (Count III), and breach of fiduciary duty (Count IV).

## BACKGROUND

The plaintiffs owned and operated a manufacturing facility in Windham, Maine.[2] The plaintiff Ben Hawkins was responsible for making the plaintiffs' insurance decisions. Hawkins has an MBA degree and is an experienced businessman. Although he does not have any particularized training or special

---

[2] The evidence does not clearly describe the intersecting interests of each plaintiff. However, it appears that the corporate plaintiffs Morse Brothers, Inc. and MB Bagging, Corp. (collectively, "MB-Plaintiffs") operated the manufacturing business in Windham and owned the related equipment; that the plaintiff T&B Associates owned the Windham facility and real estate; and that all of those business entities were owned by the individual plaintiffs Ben Hawkins and Tim Morse. Unless otherwise indicated in this decision, the court will simply refer to these parties, collectively, as the plaintiffs.

knowledge about insurance policies and coverages, for many years he has been involved in many business-related insurance issues and decisions.

Desmond was an insurance agency and from 1997 through 1999 placed business insurance coverage for the plaintiffs through Commercial Union York Insurance Company ("Commercial Union"), which included a blanket coverage limit of $1,485,000, an agreed-value endorsement, and replacement cost provisions.[3] These coverages meant that in the event of a fire loss to all or any part of the plaintiffs' property, the entire limit of $1,485,000 was available to cover the loss.

During this period, Dana Dresser was Desmond's exclusive account representative for the plaintiffs. Dresser and Hawkins met several times each year to discuss the plaintiffs' insurance matters, which centered primarily on workers compensation issues.

In 1999, Commercial Union determined that it no longer wanted to insure the plaintiffs because their loss ratio was unacceptable and because the carrier no longer wanted to cover their type of business.[4] On November 8, 1999, Wendy

---

[3] Blanket property coverage means that one aggregate tallied amount of coverage is applied to several locations or to several types of property at those locations and, when a loss occurs, the entire blanket limit is available to cover any individual loss. Agreed-amount coverage means that the insured's stated property values satisfies the insurer's requirements and that there will be no deduction for co-insurance in the event of a loss.

[4] A loss ratio of 60% or less of the total policy premium for a commercial insured was considered acceptable by Commercial Union. As of 1999, the plaintiffs' five-year property

3

Melvin, a Commercial Union underwriter, notified Desmond of the carrier's intention not to renew the plaintiffs' policy for calendar year 2000. On November 16, the insurer issued a notice of non-renewal. Commercial Union was not asked by Desmond to reconsider its non-renewal decision. In mid-December 1999, Dresser did not inform Hawkins of the insurance company's non-renewal decision. Rather, he told Hawkins that the insurer was reluctant to renew the plaintiffs' policy.

Dresser searched for replacement coverage and Commercial Union agreed to extend its policy for a few weeks while alternative coverage was sought.[5] To assist in marketing the plaintiffs' account, Desmond asked for and received, "shopping-around" numbers from Commercial Union. These figures were for illustrative purposes – that is, to give the insurance agency an idea of what policy pricing for the specified coverages might be in the marketplace based on the plaintiffs' loss history – and did not constitute an offer to renew the Commercial Union policy.

Desmond's account manager Stacy Dunning marketed the plaintiffs' account by sending out commercial insurance applications for competitive pricing to various carriers with whom Desmond did business. Among other things, the

---

package loss ratio was 427% – meaning, for every dollar of premium that the company received from the plaintiffs, it paid out $4.27 in claims against the policy. As of that same year, the plaintiffs' five-year overall loss ratio history was determined to be 239%.

[5] The Commercial Union coverage was extended to January 21, 2000, the date that a policy written by Evanston Insurance Company went into effect.

4

applications solicited coverages similar to the Commercial Union policy, including blanket, agreed-value and 100% co-insurance coverages.[6] The applications also included statements of values previously prepared by the plaintiffs.

Desmond could not find a standard carrier willing to offer blanket and agreed-values coverages to the plaintiffs. At Dresser's request, on December 29, 1999, Dunning prepared a summary of the insurance options available to the plaintiffs based on responses to the applications. The summary included Commercial Union's "shopping around" numbers, which reflected a premium approximately three times that paid by the plaintiffs for 1999. *See* Plaintiffs' Exh. 6. The summary did not clarify that Commercial Union was not offering to renew its policy.

On December 29, 1999, Dresser met with Ben Hawkins to review the summary prepared by Dunning. Although the Commercial Union quote was not an actual proposal, Dresser presented it as a policy renewal offer, which Hawkins accepted even though the premium was substantially higher than the previous year.[7]

---

[6] Interestingly, an agreed-value coverage negates any co-insurance requirement in a policy.

[7] Generally, Desmond had authority to bind coverage on behalf of Commercial Union. However, because the carrier had non-renewed the plaintiffs' policy in 1999, Desmond could not bind property package coverage for the plaintiffs for 2000 without Commercial Union's prior written approval. No such approval was ever given.

On January 6, 2000, Dunning received a phone call from a representative of Acadia Excess Underwriters (Acadia), a wholesaler for excess lines insurance companies[8], indicating that Evanston Insurance Company ("Evanston")[9] was working on the plaintiffs' application. Evanston was not a standard carrier.

On January 14, 2000, Dresser sent Dunning a memo that Hawkins wanted to stay with Commercial Union and that Dresser's boss, Royce Cross, and Melanie Campbell were checking with the carrier to see if it would be willing to write a policy for the plaintiffs.

On January 21, 2000, Acadia confirmed to Dunning that Evanston would write a policy having scheduled coverage on a per-building basis and a 100% co-insurance clause. Evanston was not willing to write blanket or agreed-value coverages. Pursuant to Dresser's instruction, Dunning arranged for a policy to be bound with that insurer and she drafted a summary of the carrier's proposal, which noted that the policy did not include blanket coverage. *See* Plaintiffs' Exh. 7. Dunning's summary also reflected that the policy had a 100% co-insurance clause and that, based on values provided by the plaintiffs, the hammermill building and its contents were insured for $325,000.

---

[8] An excess lines agency "procures insurance for customers with specialized risks who might not otherwise be able to obtain coverage through standard insurers." *County Forest Products, Inc. v. Green Mountain Agency, Inc.*, 2000 ME 161, ¶ 4, 758 A.2d 59.

[9] Desmond did not have an agency relationship with Evanston or authority to bind that company and, therefore, had to work through Acadia.

That same day, Dresser told Hawkins that Commercial Union did not want to insure the plaintiffs any longer and wanted to get off the policy; that it was the plaintiffs' decision whether to allow that to happen; and that Dresser and Cross would consider it a personal favor if Hawkins would agree to let Commercial Union get off the policy. Hawkins was angered by this, but consented to Dresser's request on condition that the plaintiffs would get a replacement policy having coverages identical to those he believed the plaintiffs had with Commercial Union. Dresser agreed to that condition even though he only had a proposal from Evanston for scheduled coverage.[10]

On January 25, 2000, Dresser met with Hawkins to review the Evanston proposal and Dunning's summary. When Hawkins realized that the policy did not include blanket coverage and was not like Commercial Union's, he insisted that the coverages be changed. Dresser assured Hawkins that the necessary changes would be made. The plaintiffs ratified the purchase of the Evanston policy on January 26, 2000. Approximately one week later, Dresser informed Hawkins that the changes had been made to the Evanston policy even though Evanston had not been asked to make any changes and none were made. Hawkins relied on Dresser's assurances.

---

[10] Dresser did not disclose to Hawkins that the Evanston policy was the only coverage he could find.

By February 24, 2000, Dunning had received and reviewed the Evanston policy documents. The policy was sent to the plaintiffs. Hawkins never read it and the plaintiffs never advised Desmond that it was erroneous in any way.

In April 2000, Dresser left the employ of Desmond and Michelle Mitchell was assigned by the agency to be the plaintiffs' account representative. On several occasions after taking over the account, Mitchell tried to meet with Hawkins and with the plaintiffs' business manager Bruce Cort, but without success. Mitchell wanted to review the plaintiffs' coverages, but did not tell Hawkins or Cort that she wanted to discuss the adequacy of those coverages. Hawkins believed that she wanted to have a "meet and greet" opportunity and discuss future renewals.

In August 2000, Hawkins informed Mitchell that two other agencies were looking at the plaintiffs' account regarding coverages for 2001. On October 10, 2000, Cort told Mitchell that responsibility for renewing the plaintiffs' account had been assigned to another agency.

On October 28, 2000, a fire substantially destroyed the plaintiffs' hammermill building and its contents. Evanston paid $90,300, based on its scheduled coverage calculation. Subsequent to the fire, the plaintiffs obtained coverages from a standard insurance carrier.

At the time of the fire, the actual value of the hammermill building and contents was $580,000 and the total replacement value was $2,000,000. If the

blanket coverage of the former Commercial Union policy had been in effect, the covered loss would have been $580,000, less a $2,000 deductible, or $578,000.

## DISCUSSION

### Count I — Breach of Contract

The plaintiffs claim that Desmond breached an oral contract to provide replacement insurance coverages identical to those that the plaintiffs believed they had with Commercial Union. Central to this claim is whether on January 25, 2000, Dresser promised to provide the plaintiffs with identical coverage in return for Hawkins' agreement to release Commercial Union from its purported policy obligations, and whether on January 25, 2000, Dresser assured Hawkins that the coverages of the Evanston policy would be changed to comport with that agreement.

The establishment of a contract requires that the parties mutually assent "to be bound by all its material terms; the assent must be manifested in the contract, either expressly or impliedly; and the contract must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties." *VanVoorhees v. Dodge*, 679 A.2d 1077, 1080 (Me. 1996) (quoting *Roy v. Danis*, 553 A.2d 663, 664 (Me. 1989)). Whether a contract existed and whether a breach has occurred are both questions of fact. *See Spottiswoode v. Levine*, 1999 ME 79, ¶ 16, 730 A.2d 166, 172; *VanVoorhees*, 679 A.2d at 1080;

9

*June Roberts Agency, Inc. v. Venture Props.*, Inc., 676 A.2d 46, 48 (Me. 1996) (quoting *Bates v. Anderson*, 614 A.2d 551, 552 (Me. 1992)).

Employing this standard and weighing the credibility of the critical evidence, the court finds and concludes that there was an oral agreement as alleged by the plaintiffs. Based on his discussions with Dresser, Hawkins reasonably believed that Commercial Union had renewed the plaintiffs' policy for 2000; that the insurer then wanted to get out of that obligation; that it was the plaintiffs' choice whether to permit that or not; and that, if the plaintiffs agreed to release Commercial Union, Desmond would agree to replace that policy with another having identical coverages. In the face of that agreement, Dresser produced the Evanston policy.

When Hawkins discovered that the Evanston policy did not provide the desired coverages and insisted that it be fixed, Dresser assured Hawkins that the Evanston policy would be changed. Although the changes were never made, Dresser assured Hawkins that they had been. Hawkins' and Dresser's characterization of their critical exchanges cannot be reconciled and Hawkins' is the more credible. He was an experienced businessman and understood the importance of insurance coverages for his businesses. The evidence discloses no good reason for Hawkins to have knowingly or intentionally agreed to accept

inferior replacement coverages.[11] Under the circumstances of this case, the court's conclusion is not altered by Hawkins failure to read the Evanston policy. *See* 3 Couch, Insurance 2d ed. 1960, § 25.60 (insured's contract claim not barred by a failure to "examine the policy[,] the principal being entitled to assume that the agent performed his duty"); *Martini v. Beaverton Ins. Agency, Inc.*, 838 P.2d 1061, 1066-67 (Or. 1992) (in a breach of contract claim, "the concept of 'fault' in the tort sense plays no role").

Based upon the foregoing, the court finds that there was a legally binding oral agreement, that Desmond acting through Dresser breached the agreement, and that it is liable to the plaintiffs in the amount that would have been due if a policy with coverages identical to the purported Commercial Union policy had been obtained. *See County Forest Products, Inc. v. Green Mountain Agency, Inc.*, 2000 ME 161, ¶ 44, 758 A.2d 59, 70 (citing *Bramson v. Chester L. Jordan & Co.*, 379 A.2d 730, 732 (Me. 1977)).

As previously noted, if the coverages of the former Commercial Union policy had been in effect at the time of the fire, the covered loss would have been $580,000, less a $2,000 deductible, or $578,000. After accounting for the payment made by Evanston, the plaintiffs' resulting loss is $487,700.

---

[11] The court is mindful that the Evanston policy premium was substantially lower than Commercial Union's purported premium for 2000. However, the court cannot conclude that this price difference was the reason that the plaintiffs agreed to go with Evanston. Hawkins had recently agreed without reservation to pay Commercial Union's higher premium because of its good reputation and because of the coverages he believed it was providing to the plaintiffs.

Count III — Negligent Misrepresentation

The plaintiffs also claim that Desmond, acting through Dresser, negligently misrepresented that the replacement policy with Evanston had been changed to provide coverages identical to the purported Commercial Union policy. Negligent misrepresentation occurs when

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(a)(1) (1977). The elements of this claim have been established.

Desmond had a pecuniary interest in its long-standing business relationship with the plaintiffs to procure and renew business insurance. On December 29, 1999, Hawkins was misled into believing that Commercial Union had offered to renew its policy for 2000 and that the plaintiffs' acceptance of that "offer" had resulted in a bona fide policy with blanket and agreed-values coverages.

On January 21, 2000, Dresser misrepresented to Hawkins that Commercial Union wanted to get out the non-existent policy and that it was the plaintiffs' decision whether to allow that to happen. In order to get Hawkins to "release" Commercial Union, Dresser agreed to obtain an identical replacement policy.

12

When Hawkins realized that the Evanston proposal did not include blanket coverage, Dresser assured Hawkins that the policy would be changed and subsequently told Hawkins that the policy had been changed to provide the desired coverages.

In all of this, Dresser unquestionably failed to exercise reasonable care or competence in obtaining and conveying this information to Hawkins. He knew or should have known that the information was wrong, and he intended that it would guide the plaintiffs and be relied upon by them. The plaintiffs, acting through Hawkins, justifiably relied on Dresser's misrepresentations and believed they had the coverages they desired. However, the analysis does not end there.

When the court earlier granted Desmond's motion for judgment regarding the plaintiffs' claim of negligence (Count II), it concluded that Hawkins' failure to read the Evanston policy rendered the plaintiffs comparatively negligent to a degree at least equal to Desmond. Although the court now considers the claim of negligent misrepresentation, "the ordinary rules as to negligence apply." RESTATEMENT (SECOND) OF TORTS § 552A, cmt. a (1977).[12]

Under the relevant circumstances, the court concludes that Hawkins' failure to read the Evanston policy in spite of Dresser's assurances was unreasonable in

---

[12] However, contributory or comparative negligence does not bar recovery by one who justifiably relies on a fraudulent misrepresentation. *Id.*

the light of the foreseeable risks and rendered the plaintiffs' contributorily negligent and any recovery on this count is barred. *See id.*

Count IV — Breach of Fiduciary Duty

Finally, the plaintiffs claim that Desmond breached a fiduciary duty that it owed them. Under Maine law, a fiduciary relationship requires "(1) the actual placing of trust or confidence in fact by one party in another, and (2) a great disparity of position and influence between the parties at issue." *Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶ 10, 762 A.2d 44, 46 (quoting *Bryan R. v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 1999 ME 144, ¶ 19, 738 A.2d 839, 846). The Law Court has held that "[t]o demonstrate the necessary disparity of position and influence . . . a party must demonstrate diminished emotional or physical capacity or . . . the letting down of all guards and bars." *Id.,* ¶ 11, 762 A.2d at 46. "The existence of a confidential [or fiduciary] relationship remains a question of fact and need not be imposed by law." *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975). Additionally, the Law Court has noted that

> [a] fiduciary duty will be found to exist, as a matter of law, only in circumstances where the law will recognize both disparate positions of the parties and a reasonable basis for the placement of trust and confidence in the superior party in the context of specific events at issue. A court, therefore, must have before it specific facts regarding the nature of the relationship that is alleged to have given rise to a fiduciary duty in order to determine whether a duty may exist at law.

14

*Bryan R.*, 1999 ME 144, ¶ 20, 738 A.2d at 846. In the present case, there was no confidential or trust relationship.

The plaintiffs also assert that Desmond had a special agency relationship to act as their consultant, and that Desmond breached its duty when it failed to effectively notify the plaintiffs about the inadequacy of the Evanston policy.

"[A]n insurance agent generally assumes only those duties found in an ordinary agency relationship, that is, to use reasonable care, diligence, and judgment in obtaining the insurance coverage requested by the insured party." *Szelenyi v. Morse, Payson & Noyes, Ins.*, 594 A.2d 1092, 1094 (Me. 1991). "An insurance agent does not have a duty to advise an insured about adequacy of coverage merely because an agency relationship exists between the parties." *Id.* Instead, prior to a duty arising a special agency relationship must be found to exist between the parties. *Id.* In this analysis, the court must review the course of dealings between the parties in order to determine the existence of a special agency relationship, and must look for evidence that the parties had agreed that the agency would give advice regarding the adequacy of insurance coverages. *See id..*

Here, the plaintiffs and Desmond unquestionably had a long-standing business relationship during which Dresser regularly arranged blanket insurance coverage on the plaintiffs' Windham property through Commercial Union. However, there is no competent evidence that Dresser agreed to advise the

15

plaintiffs about the sufficiency of their coverages. Accordingly, the court concludes that there was no more than an ordinary agent-insured relationship.

## DECISION

Pursuant to M.R. Civ. P. 79(a), the Clerk is directed to enter this Order on the Civil Docket by a notation incorporating it by reference, and the entry is

A. <u>As to Docket No. CV-02-365,</u>

On Count I of Plaintiffs' Complaint, Judgment for Plaintiffs and against Defendant Desmond & Payne, Inc., in the amount of $487,700, together with pre-judgment interest at the rate of 3.28% and post-judgment interest at the rate of 8.77%; and

On Counts II, III and IV of Plaintiffs' Complaint, Judgment for Defendant Desmond & Payne, Inc.

B. <u>As to Docket No. CV-03-429,</u>

On Counts I, II and III of Plaintiffs' Complaint, Judgment for Defendant OneBeacon Insurance Company; and

On Defendant OneBeacon's Counterclaim, Judgment for Plaintiffs.

Dated: April 20, 2005

Justice, Superior Court

16

MORSE BROTHERS INC. - PLAINTIFF

Attorney for: MORSE BROTHERS INC.
RALPH A DYER  - RETAINED 07/26/2002
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


T & B ASSOCIATES - PLAINTIFF

Attorney for: T & B ASSOCIATES
RALPH A DYER  - RETAINED 07/26/2002
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


NO. 224, LLC - PLAINTIFF

Attorney for: NO. 224, LLC
RALPH A DYER  - RETAINED 07/26/2002
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


BEN HAWKINS  - PLAINTIFF

Attorney for: BEN HAWKINS
RALPH A DYER  - RETAINED 07/26/2002
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


TIM MORSE  - PLAINTIFF

Attorney for: TIM MORSE
RALPH A DYER  - RETAINED 07/26/2002
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


MB BAGGING CORP. - PLAINTIFF

Attorney for: MB BAGGING CORP.
RALPH A DYER  - RETAINED 07/26/2002
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


vs

SUPERIOR COURT
CUMBERLAND, ss.
Docket No  PORSC-CV-2002-00365


**DOCKET RECORD**

DESMOND & PAYNE INC. - DEFENDANT


Attorney for: DESMOND & PAYNE INC.
BERNARD KUBETZ  - RETAINED 08/15/2002
EATON PEABODY
80 EXCHANGE ST
PO BOX 1210
BANGOR ME 04402-1210


Attorney for: DESMOND & PAYNE INC.
LAURA LEE KLEIN  - RETAINED 01/21/2003
EATON PEABODY
80 EXCHANGE ST
PO BOX 1210
BANGOR ME 04402-1210


ONEBEACON INSURANCE COMPANY - DEFENDANT
ACADIA EXCESS UNDERWRITERS - THIRD PARTY DEFENDANT


Attorney for: ACADIA EXCESS UNDERWRITERS
JAMES M BOWIE  - RETAINED 04/24/2003
THOMPSON & BOWIE
THREE CANAL PLAZA
PO BOX 4630
PORTLAND ME 04112-4630



Filing Document: COMPLAINT               Minor Case Type: CONTRACT
Filing Date: 07/26/2002

## Docket Events:

07/26/2002 FILING DOCUMENT - COMPLAINT FILED ON 07/26/2002
           WITH EXHIBITS A-F

07/26/2002 Party(s):  MORSE BROTHERS INC.,T & B ASSOCIATES,NO. 224, LLC,BEN HAWKINS,TIM MORSE,MB BAGGING
              CORP.
           DISCOVERY FILING - NOTIFICATION DISCOVERY SERVICE FILED ON 07/26/2002
           PLAINTIFFS FIRST SET OF INTERROGATORIES AND FIRST REQUEST FOR PRODUCTIONOF DOCUMENTS
           PROPOUNDED UPON DEFENDANT, DESMOND & PAYNE SERVED ON DESMOND & PAYNE INC. C/O DANIEL G
           MCKAY ON 7-25-02

08/01/2002 Party(s):  MORSE BROTHERS INC.
           ATTORNEY - RETAINED ENTERED ON 07/26/2002
           Plaintiff's Attorney: RALPH A DYER

08/01/2002 Party(s):  T & B ASSOCIATES
           ATTORNEY - RETAINED ENTERED ON 07/26/2002
           Plaintiff's Attorney: RALPH A DYER

           Party(s):  NO. 224, LLC
           ATTORNEY - RETAINED ENTERED ON 07/26/2002
           Plaintiff's Attorney: RALPH A DYER

           Party(s):  BEN HAWKINS

MORSE BROTHERS INC. - PLAINTIFF

Attorney for: MORSE BROTHERS INC.
RALPH A DYER  - RETAINED 07/30/2003
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


MB BAGGING, CORP. - PLAINTIFF

Attorney for: MB BAGGING, CORP.
RALPH A DYER  - RETAINED 07/30/2003
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


T & B ASSOCIATES - PLAINTIFF

Attorney for: T & B ASSOCIATES
RALPH A DYER  - RETAINED 07/30/2003
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


NO. 224, LLC - PLAINTIFF

Attorney for: NO. 224, LLC
RALPH A DYER  - RETAINED 07/30/2003
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


BEN HAWKINS  - PLAINTIFF

Attorney for: BEN HAWKINS
RALPH A DYER  - RETAINED 07/30/2003
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


TIM MORSE  - PLAINTIFF

Attorney for: TIM MORSE
RALPH A DYER  - RETAINED 07/30/2003
LAW OFFICES OF RALPH A DYER PA
477 CONGRESS STREET SUITE 1010
PO BOX 9739-1164
PORTLAND ME 04104


VS

**DOCKET RECORD**

ONEBEACON INSURANCE COMPANY - DEFENDANT

Attorney for: ONEBEACON INSURANCE COMPANY
HARRISON RICHARDSON  - RETAINED 07/30/2003
RICHARDSON WHITMAN LARGE & BADGER
465 CONGRESS ST, SUITE 900
PO BOX 9545
PORTLAND ME 04112-9545


Attorney for: ONEBEACON INSURANCE COMPANY
JOHN B LUCY  - RETAINED 07/30/2003
RICHARDSON WHITMAN LARGE & BADGER
ONE MERCHANTS PLAZA, SUITE 603
PO BOX 2429
BANGOR ME 04402-2429


Filing Document: NOTICE OF REMOVAL          Minor Case Type: OTHER EQUITABLE RELIEF
Filing Date: 07/30/2003

## Docket Events:

07/31/2003 FILING DOCUMENT - NOTICE OF REMOVAL FILED ON 07/30/2003
           ALL PAPERWORK RECEIVED FROM ANDROSCOGGIN COUNTY SUPERIOR COURT FOR CONSOLIDATION WITH
           CUMBERLAND SUPERIOR COURT CASE CV 02-365

07/31/2003 Party(s):  MORSE BROTHERS INC.
           ATTORNEY - RETAINED ENTERED ON 07/30/2003
           Plaintiff's Attorney: RALPH A DYER

           Party(s):  MB BAGGING, CORP.
           ATTORNEY - RETAINED ENTERED ON 07/30/2003
           Plaintiff's Attorney: RALPH A DYER

           Party(s):  T & B ASSOCIATES
           ATTORNEY - RETAINED ENTERED ON 07/30/2003
           Plaintiff's Attorney: RALPH A DYER

           Party(s):  NO. 224, LLC
           ATTORNEY - RETAINED ENTERED ON 07/30/2003
           Plaintiff's Attorney: RALPH A DYER

07/31/2003 Party(s):  BEN HAWKINS
           ATTORNEY - RETAINED ENTERED ON 07/30/2003
           Plaintiff's Attorney: RALPH A DYER

           Party(s):  TIM MORSE
           ATTORNEY - RETAINED ENTERED ON 07/30/2003
           Plaintiff's Attorney: RALPH A DYER

07/31/2003 Party(s):  ONEBEACON INSURANCE COMPANY
           ATTORNEY - RETAINED ENTERED ON 07/30/2003
           Defendant's Attorney: HARRISON RICHARDSON

07/31/2003 Party(s):  ONEBEACON INSURANCE COMPANY

Printed on: 04/22/2005