STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT
CIVIL ACTION
DOCKET NO. BCD-CIV-2022-00042

BAYVIEW COURT ASSOCIATES, LLC )
and EASTERN PROMENADE )
LIMITED LIABILITY COMPANY )
)
)
Plaintiffs, )
)
)
)
)
v. )          FINDINGS, CONCLUSIONS,
)          AND ORDER
)
)
)
CITY OF PORTLAND, )
)
Defendant. )

INTRODUCTION

This matter is before the court for decision following a hearing held on November 8, 2022, by ZOOM. Bayview Court Associates, LLC and Eastern Promenade Limited Liability Company (the "Plaintiffs") initiated this action, wherein they seek declaratory and injunctive relief[1] against the City of Portland (the "Defendant" or "City"). MTM Acquisitions, Inc., d/b/a the *Portland Press Herald/Maine Sunday Telegram* was granted intervenor status, without objection, on June 2, 2021. At issue is whether compilations of rental data assembled by Plaintiffs and submitted to the Defendant in compliance with the City of Portland's Residential Rental Unit Registration Requirements ordinance and Rent Control and Tenant Protections ordinance constitute "trade secrets" within the meaning of the Maine Trade Secrets Act that are excepted from public disclosure under the State of Maine's Freedom of Access Act. The case

---

[1] Count I of Plaintiffs' Complaint prays for declaratory relief; Count II for injunctive relief. (Pl.s' Compl. ¶¶ 23-32.)

1

was accepted for transfer to the Business & Consumer Docket on August 29, 2022, in anticipation of the hearing before this court.

DISCUSSION

The following findings of fact and conclusions of law are based on the parties' stipulations, witness testimony heard by the court[2], and the exhibits offered and admitted into evidence by agreement.

## I.    Findings of Fact

### A.    The City's rental unit registration requirements.

The Permitting & Inspections Department ("P&I Department") is the City department that administers the City's Building & Building Regulations Ordinance, which comprises Chapter 6 of the City's Code of Ordinances.  (Joint Final Pretrial Statement, Stipulations ¶¶ 1-2 [hereinafter "Stipulations"].)   Chapter 6 of the Code of Ordinances includes the City's Residential Rental Unit Registration Requirements ordinance and Rent Control and Tenant Protections ordinance.  (Stipulations ¶ 3.)

The Residential Rental Unit Registration Requirements ordinance (the "Rental Unit Registration Ordinance"), Portland, Me., Code §§ 6-150-157 (Nov. 3, 2020), generally requires that all rental units within the City must be registered therewith.  (Stipulations ¶ 4; Ex. A.)  To register a unit as required by section 6-151, the unit's owner must submit an application form that provides information about the unit to the City.  (Stipulations ¶ 5, Ex. A, at § 6-151(b); Ex. C.)  This information includes (1) the unit's street address and unit number; (2) the tax chart, block and lot of the building in which the unit is located; (3) the identity of the manager of the property, with their name, phone number and street address; (4) the identity of the unit's owner,

---

[2] Plaintiffs' witnesses who appeared before the court during the November 8, 2022, hearing were Lloyd Lathrop, Plaintiffs' individual owner, sole member and sole employee, (Stipulations ¶ 18), and Crystal Auger of Dirigo Management Company.  Zachery Lenhert, a City employee, testified for the Defendant.

2

with their name, phone number, street address and email address; or (5) if the owner is not a natural person, the name of every individual with any ownership interest in the entity that owns the unit, along with the address, phone number and email address of at least one such natural person; and (6) the name, address, phone number, and email address of the person designated as the owner's agent for service of notice and civil process by the City. (Stipulations ¶ 5; Ex. A, at § 6-151(b); Ex. C.)

The Rental Unit Registration Ordinance further requires registrants submit all registration information to the City "on forms supplied by the City's [P&I] Department." (Stipulations ¶¶ 5, 11; Ex. A, at § 6-151(b); Ex. C.) The City, through the P&I Department, gathers registration information and collates it to track registrants' compliance with the registration requirements. (Stipulations ¶ 12.)

The Rental Unit Registration Ordinance was originally adopted by the City during June 1989, and last amended during 2020 pursuant to the City of Portland voters' adoption of a citizens-initiated amendment. (Stipulations ¶¶ 6, 7, 9.) The amendment added a new subsection to the ordinance—section 6-151(f). (Stipulations ¶ 9.) This amendment was made concurrently with the voters' approval and adoption of the Rent Control and Tenant Protections ordinance (the "Rent Control Ordinance"), Portland, Me., Code §§ 6-230-242 (Nov. 3, 2020). (Stipulations ¶ 8; Ex. B.)

The amended Rental Unit Registration Ordinance requires registrants subject to the Rent Control Ordinance to provide additional information about registered units. (Stipulations ¶ 10.) For example, these registrants are newly required to provide information about (1) the amount of rent charged to the tenant occupying the unit, including details about increased rents; (2) the amount of security deposits collected from the tenant; (3) the number of bedrooms and

3

bathrooms within the unit; (4) the number of bedrooms and bathrooms, and the presence of a kitchen within the unit. (Stipulations ¶ 10; Ex. A, at § 6-151(f); Ex. C.) Following adoption of section 6-151(f) during 2020, the P&I Department began gathering registration information required under that section using the "Supplemental Information" addendum to the City's registration application form. (Stipulations ¶ 13; Ex. C.) The supplemental information can be submitted using one of three form templates provided by the City: a printed form, a fillable PDF document or a Microsoft Excel spreadsheet. (Stipulations ¶ 14.)

B. Plaintiffs' marketing and operations; confidentiality and compliance.

Plaintiffs, who own approximately 120 registered rental units between them, are in the business of leasing property to residential tenants in the City of Portland. (Stipulations ¶¶ 16-17.) Plaintiffs submitted spreadsheets[3] with registration information for their units to the City on March 31 and December 30, 2021 (the "Compilations"). (Stipulations ¶ 15.) Plaintiffs marked each of their submissions with an express claim of confidentiality and exemption from Freedom of Access Act ("FOAA") disclosure. (Stipulations ¶ 15.)

The market for residential leasing in Portland is highly competitive. (Stipulations ¶ 19.) To stay competitive, Plaintiffs occasionally advertise individual rental units using digital advertising platforms like Zillow.com, Apartments.com, Facebook Marketplace, Cozyco.com, and affiliated platforms. (Stipulations ¶ 20.) They also advertise units on Realtor.com or Craigslist.com from time to time. (Stipulations ¶ 21.) Advertisements posted by Plaintiffs on these platforms state the monthly rental rate sought by the landlord for the individually advertised units. (Stipulations ¶ 22.) These advertisements provide no conclusive information

_____

[3] In evidence are Bayview Court Associates, LLC's March 2021 submission (Ex. D) and December 2021 submission (Ex. E), as well as Eastern Promenade Limited Liability Company's March 2021 submission (Ex. F) and December 2021 submission (Ex. G). The rental amounts, security deposit amounts, and total payment amounts are redacted in each of these exhibits. (Stipulations ¶ 15.)

4

regarding the amount of rent the landlord ultimately accepts for a lease, or the length of a lease's term. (Stipulations ¶ 24.) Plaintiffs also rent units without advertising them, for example by entering into a new lease with an existing tenant whose lease is expiring. (Stipulations ¶ 25.)

Plaintiffs contract with Dirigo Property Management Company ("Dirigo"), a full-service third-party property management company, to provide leasing, accounting, maintenance and management services for Plaintiffs' properties. (Stipulations ¶ 23.) Approximately one-half of the properties serviced by Dirigo are in the City of Portland. These properties number in the thousands. Dirigo also assists Plaintiffs with advertising, as described above, for units that are advertised. (Stipulations ¶ 26.)

Plaintiffs and Dirigo executed a Management Agreement that creates an agency between Dirigo and Plaintiffs. (Stipulations ¶ 27.) The agreement contains no express prohibition on Dirigo's disclosure of any lease terms, including the amount of rent charged for a unit, for Plaintiffs' units. (Stipulations ¶ 27.) Nor do Plaintiffs possess any lease, contract, agreement or similar document containing any such prohibition on tenants or third parties. (Stipulations ¶ 29.) Neither Plaintiff maintains a written policy or procedure to identify information it deems confidential. (Stipulations ¶ 32.)

Crystal Auger, a property manager and leasing agent at Dirigo, testified credibly about her work for Plaintiffs as a representative of Dirigo. Ms. Auger prepared the Compilations for Plaintiffs. To do so she collected accounting data for Plaintiffs' properties that she then cross-referenced with their leases on file. Then, she used one of the City's forms to compile and collate the data. The versions of the Compilations submitted to the City showed dollar amounts in the columns redacted in Exhibits D-G. Where a unit is vacant, Ms. Auger entered a zeroed-out dollar amount in the Compilations. Ms. Auger needed between three and five hours in total

to complete each of the Compilations for Plaintiffs. She does not typically prepare similar compilations for other Dirigo clients, but she has access to similar information about their rentals. Ms. Auger did not prepare the Compilations for her or Dirigo's own purposes, but specifically for submission to the City on behalf of Plaintiffs. No such data was compiled for Plaintiffs before 2020, when the City first required landlords' unit registration according to its amended ordinance. Plaintiffs did not pay a fee to Dirigo in addition to their scheduled payments in order to procure the Compilations.

Ms. Auger did not disclose the data entered into the Compilations to anyone other than Mr. Lathrop or Plaintiffs' counsel because she believed it to be "the owner's private information" and a matter of client privacy. The Compilations were neither stored by Dirigo as password-protected nor "confidential" files. However, they were kept in a separate and private digital folder to which only Ms. Auger and her colleague property managers and leasing agents had access.

Ms. Auger is subject to a non-disclosure agreement ("NDA") through her contract of employment with Dirigo. However, there are no NDAs between Ms. Auger and Plaintiffs. Dirigo does not require an NDA before discussing or negotiating rents with a prospective tenant, and there is no NDA included in tenants' leases. Thus, there is nothing to prevent individual tenants from sharing or publicizing their rental information. Mr. Lathrop shares information about Plaintiffs' properties with Dirigo as Plaintiffs' agent, and neither Plaintiff experienced a breach of confidence by Dirigo. Plaintiffs rely on an implied confidentiality agreement with Dirigo to avoid such breaches. However, neither Plaintiff has an exclusive agency with Dirigo. Plaintiffs, like Dirigo's other clients, seek Dirigo's advice about market rents and on other topics from time to time. Plaintiffs, however, have not asked Dirigo to provide the rent-ranges for

6

competing landlords' properties. If they did so ask, Plaintiffs expect Dirigo would refuse disclosure. Nonetheless, when Dirigo advises Plaintiffs and its other clients on market rents and other topics, it does so with knowledge of actual rent-ranges for all of its clients' properties, including Plaintiffs'.

Mr. Lathrop testified credibly about his approach to operating Plaintiffs' businesses. Mr. Lathrop is a commercial real estate investor, having worked in the commercial real estate industry since 1994. During this time, he accumulated industry-specific expertise. Mr. Lathrop relies on his expertise to manage Plaintiffs as successful companies. According to Mr. Lathrop, cost control is key to success in the residential rental market. This means Plaintiffs' properties are managed according to the revenue they are expected to generate, and when it can be generated. The amount of rent charged for a unit is accordingly subject to changes in market conditions, and Mr. Lathrop relies on his accumulated knowledge and expertise to navigate these changes and set competitive rents for Plaintiffs' units.

Mr. Lathrop does not believe the data reflected in the Compilations should be available for public consumption. He would never disclose the rents or vacancy rate for Plaintiffs' units because of competitive risk flowing from disclosure (e.g., a competitor aware of lowered rents charged by a landlord due to a high rate of vacancies can lower their rents to attract tenants away from the landlord, which could harm the landlord's business). Similar information about a competitor's properties could be valuable to Plaintiffs. Yet, Plaintiffs have not submitted a request with the City for any information about competitors' properties.

To determine the amount of rent charged for each unit, Plaintiffs typically utilize a routine process. (Stipulations ¶ 28.) First, as a tenancy comes up for renewal, Plaintiffs discuss with the property manager (1) the quality of the tenant, (2) their judgment regarding what the

7

current market rate for the unit should be, (3) whether renewal or turnover of the unit is more desirable, (4) what the likely costs of repair and renovation will be for turnover, (5) whether the incumbent tenant wants to renew, and if so (6) what rent they are expected to be willing to pay. (Stipulations ¶ 28(a).) Then, a decision is made whether to offer a lease renewal, and at what rate. (Stipulations ¶ 28(a).) If the unit is offered for renewal, the new rate and term will be proposed to the incumbent tenant with an invitation to execute the new lease. (Stipulations ¶ 28(a).) If the incumbent tenant is not offered renewal or does not want to renew, then the unit might be immediately put back on the market or it might be renovated first. (Stipulations ¶ 28(b).) Once a unit is ready to go back on the market, Plaintiffs give further consideration to what rent the market will bear, what costs of renovation need to be recovered, overall investment performance and the need for adequate return. (Stipulations ¶ 28(b).) The asking rent is determined based on consideration of these factors. (Stipulations ¶ 28(b).) The rent charged for the unit is then reached by agreement in a negotiation between the Plaintiffs and the tenant. (Stipulations ¶ 28(b).)

Since enactment of the Rental Control Ordinance, Plaintiffs also consider its requirements when determining an asking rent for a unit. (Stipulations ¶ 28(b).) Otherwise, Plaintiffs cannot say how their property management strategy would change if the Compilations' data is deemed "public records" within the meaning of FOAA. Mr. Lathrop testified that Plaintiffs always look for the best quality tenants and that they would continue to do so if the Compilations become publicly available. So too would Plaintiffs' analyses and judgments based on current market-rate rents and unit conditions.

Generally, Ms. Auger does not negotiate rents with tenants for Plaintiffs, but she has done so on occasion. When asked for input about the rental price for a unit, Ms. Auger may

8

provide landlords with a "high-low" value estimate (where the "low" is the minimum rent the landlord is willing to accept) based on information about comparable units and on public information about rentals citywide. Ms. Auger does perform marketing and advertising for Plaintiffs' units. Not every unit leased through Dirigo is advertised to the public. Advertisements are required to include a listing price, but that price may, or may not (i.e., when the advertisement is based on a high-low arrangement) reflect the actual rent sought by the landlord for the advertised unit. Landlords reserve the right to negotiate the final amount of rent for an advertised unit with a prospective tenant. Thus, advertisements about Plaintiffs' units alone provide no basis for reconstruction of the Compilations.

Plaintiffs have no document that assigns a precise dollar value to, calculates or estimates the "significant economic value" they allege is derived from their own compilations of rental and occupancy data. (Stipulations ¶ 30.) Nor do they maintain any document that estimates the dollar value of Plaintiffs' rental and occupancy data to competitors. (Stipulations ¶ 31.)

Each year the City requests that commercial landlords, including Plaintiffs, voluntarily submit rental income information for their properties for property tax valuation purposes. (Stipulations ¶ 33.) The City's solicitations expressly state that all information submitted in response to these requests is confidential under Maine law. (Stipulations ¶ 33.) The City Assessor conducted a citywide property revaluation for the fiscal year 2022, valuing properties as of April 1, 2020. (Stipulations ¶ 34.) In connection with that process and an informal review of the City's preliminary valuation determinations, the City invited Plaintiffs to submit "rent rolls" and other financial information to inform the City's review of its valuation of Plaintiffs' properties. (Stipulations ¶ 35.) The Plaintiffs submitted the rent rolls, as invited, claiming the

9

listed information is confidential and exempt from FOAA disclosure. (Stipulations ¶ 36; Ex. H; Ex. I.)

### C. The City's tracking and enforcement of rental unit registrations.

Zachary Lenhert, a licensing and business manager who works for the City's P&I Department testified about the City's treatment of rental registration submissions. In his role for the City, Mr. Lenhert reviews landlords' applications for rental registrations and administers the rental registration requirements of the Rental Unit Registration Ordinance. Mr. Lenhert testified reliably about the P&I Department's work to enforce the requirements.

There are approximately 4,500 unique registrations for the approximately 20,000 rental units within the City of Portland. Landlords must timely submit a registration application for each of their units, subject to a late fee. Mr. Lenhert and P&I Department staff review each application for completeness, then enter the data provided by applicants into a software system, EnerGov. Beyond the P&I Department, the rental registration data saved to the EnerGov system is generally accessible only by City staff, but it is linked to other systems that make it available to the public (e.g., through the City's "Citizen Self Service Portal"). Once entered into EnerGov, the information is organized by registrant. The Compilations themselves are not available to the public, only the information extracted therefrom and entered into Energov is. Plaintiffs' Compilations receive no special treatment to protect their confidentiality in response to FOAA requests, even though they were watermarked "confidential." The City designates a FOAA officer to respond to such requests.[4]

Without a FOAA request or access to the City's or Plaintiffs' records, it would be challenging (a "fool's errand," according to Mr. Lathrop) for a competitor or third party to locate the data (e.g., the vacancy rate for the reported properties) underlying the Compilations, and to

---

[4] Plaintiffs do not challenge the City's process for responding to FOAA requests.

recreate them. Sometimes, landlords can infer rental prices and vacancy rates for their competitors' properties based on market trends and marketing or renovation activity. Appraisers and other third parties (including tenants) may have information about rents for specific units, but not for all of Plaintiffs' units.

## II.    Conclusions of Law

The purpose of FOAA, 1 M.R.S. §§ 400-414 (2022), "is to open public proceedings and require that public actions and records be available to the public." *Town of Burlington v. Hosp. Admin. Dist. No. 1*, 2001 ME 59, ¶ 13, 769 A.2d 857. To promote such objectives, FOAA must be liberally construed. *Id.*; 1 M.R.S. § 401 (2022). Concomitant to liberal construction of FOAA's provisions is "a strict construction of any exceptions to the required public disclosure." *Guy Gannett Pub. Co. v. Univ. of Me.*, 555 A.2d 470, 471 (Me. 1989) (citation omitted).

FOAA provides that every person has the right to inspect and copy any public record. 1 M.R.S. § 408-A (2022). FOAA defines "public record" as "[a]ny written . . . matter or electronic data compilation from which information can be obtained . . . that is in the possession or custody of an agency or public official of [the State of Maine] or any of its political subdivisions . . . and has been received or prepared for use in connection with the transaction of public or governmental business." *Id.* § 402(3). While it provides liberal access to public records, FOAA also provides statutory exceptions to the definition of the term "public record." *See id.* One such exception is "records that would be within the scope of a privilege against discovery or use as evidence recognized by the courts of [the State of Maine] in civil or criminal trials if the records or inspection thereof were sought in the course of a court proceeding." *Id.* § 402(3)(B).

Plaintiffs claim this exception applies to the Compilations of rental data, *see supra* 4 note 3, which they argue constitute trade secrets within the meaning of Maine Rule of Evidence 507[5]

11

and Maine Rule of Civil Procedure 26(c)(7).[6] Neither rule defines the term "trade secret," but the Law Court has held that the definition contained within the Maine Trade Secrets Act ("MTSA"), 10 M.R.S. §§ 1541-1548, is a "useful guidepost." *Town of Burlington*, 2001 ME 59, ¶ 21, 769 A.2d 857. The Defendant disagrees. Defendant argues in turn that data prepared for and submitted to the City for the purpose of compliance does not constitute a trade secret within the meaning of the MTSA and cannot be exempt from public disclosure under FOAA.

The MTSA defines a trade secret as:

**4. Trade secret.** "Trade secret" means information, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that:

**A.** Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

**B.** Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

10 M.R.S. § 1542(4) (2022). This is a two-part test, and to qualify as a trade secret the Compilations must satisfy each of the statute's subsections. Plaintiffs, as the parties seeking

---

[5] Maine Rule of Evidence 507 provides:

(a) **General rule.** A person has a privilege to refuse to disclose, and to prevent any other person from disclosing, a trade secret that the person owns.
(b) **Who may claim the privilege.** The privilege may be claimed by:
    (1) The person who owns the trade secret;
    (2) The person's agent; or
    (3) The person's employee.

M.R. Evid. 507.

[6] Maine Rule of Civil Procedure 26(c)(7) provides:

(c) Protective Orders. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, any justice or judge of the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including without limitation one or more of the following . . . (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way.

M.R. Civ. P. 26(c)(7).

12

injunctive relief and denial of requests to inspect records pursuant to FOAA, have the burden of establishing these elements. *See Alcom, LLC v. Temple*, No. 1:20-cv-00152-JAW, 2020 U.S. Dist. LEXIS 79863, \*16 (D. Me. 2020) (injunctive relief); *Blue Sky West, LLC v. Me. Revenue Servs.*, 2019 ME 137, ¶ 23, 215 A.3d 812 (FOAA) (citations omitted).

A. 10 M.R.S. § 1542(4)(A).

Maine courts consider the following factors to determine whether the information "derives independent economic value . . . from not being generally known [or] readily ascertainable" within the meaning of section 1542(4)(A):

> (1) the value of the information to the plaintiff and to its competitors; (2) the amount of effort or money the plaintiff expended in developing the information; (3) the extent of measures the plaintiff took to guard the secrecy of the information; (4) the ease or difficulty with which others could properly acquire or duplicate the information; and (5) the degree to which third parties have placed the information in the public domain or rendered the information readily ascertainable through patent applications or unrestricted product marketing.

*Spottiswoode v. Levine*, 1999 ME 79, ¶ 27 n.6, 730 A.2d 166 (citations omitted).

*i. The information's value to the Plaintiffs and to their competitors.*

Mr. Lathrop testified about the Compilations' value to Plaintiffs as a product of his expertise in commercial residential real estate accumulated over many years. He also testified about the value of the information recorded in the Compilations to Plaintiffs' process for setting rents for their units. Finally, he testified about the Compilations potential value to Plaintiffs' market competitors.

The Compilations, undoubtedly, are valuable to Mr. Lathrop and to Plaintiffs, whose businesses benefit from the data's utility to strategic planning. They might also be valuable to Plaintiffs' competitors, insofar as the data might provide an economic benefit by informing their business strategy without the need to expend resources and by improving their competitive position relative to Plaintiffs'. *See Blue Sky West, LLC,*

13

2019 ME 137, ¶ 37, 215 A.3d 812. However, the record evidence here is comprised of Plaintiffs' assertions, which describe Plaintiffs' perceived competitive risk. The Plaintiffs do not identify a specific competitive harm. Without more, the record does not support dispositive findings about the Compilations' actual value to Plaintiffs or their competitors. *See id.*

> ii. *The amount of effort or money the Plaintiffs expended in developing the information.*

Staff at Dirigo used between three and five hours to prepare the Compilations. They used template forms provided by the City to format the data. Plaintiffs did not make payments to Dirigo in addition to its base fee to have the Compilations prepared. Even though the Compilations reflect, in part, Plaintiffs' market knowledge developed over many years, Plaintiffs affirmatively expended little effort or money to develop the Compilations. This factor weighs against finding the Compilations constitute "trade secrets." *See Cent. Me. Healthcare Corp. v. Me. Bureau of Ins.*, No. BCD-AP-13-03, 2014 WL 3824324, at *18 (Me. B.C.D. July 29, 2014).

> iii. *The extent of measures the Plaintiffs took to guard the secrecy of the information.*

Dirigo, which created the Compilations, does not save the Compilations in password-protected digital folders. Plaintiffs have no NDA with the Dirigo staff who created the Compilations. Nor do they have NDAs with their tenants, each of whom knows the amount of their rent. Plaintiffs labeled the Compilations "confidential" for submission to the City. Otherwise, they rely on a "implied" confidentiality agreement with Dirigo. Absent stronger evidence of Plaintiffs' imposition of a duty upon others to keep the Compilations secret, Plaintiffs did not carry their burden to show the

14

Compilations were the subject of meaningful efforts to preserve their secrecy. *See Town of Burlington*, 2001 ME 59, ¶ 22, 769 A.2d 857.

> iv.     *The ease or difficulty with which others could properly acquire or duplicate the information.*

The court agrees with Plaintiffs that efforts to independently acquire or duplicate the information contained in the Compilations would amount to a "fool's errand." Dirigo advertises a listing price for advertised units to the public. Also, tenants know their rents and they are not prevented from disclosing that information. However, to acquire or duplicate the information contained in the Compilations using these sources alone would be highly difficult. Otherwise, an interested third party must submit a FOAA request to the City to obtain the information in question. This factor favors finding a "trade secret."

> v. *The degree to which third parties have placed the information in the public domain or rendered the information readily ascertainable through unrestricted product marketing.*

Plaintiffs, through Dirigo, advertised vacancies from time to time. However, marketing for Plaintiffs' units was not "unrestricted." Plaintiffs did not advertise units when the lease was likely to be renewed by an incumbent tenant, or when it could reach out directly to a known prospective tenant. Moreover, information Plaintiffs included in their advertisements does not always reflect the actual rent they sought. Be that as it may, Dirigo knows the actual rents for Plaintiffs properties. While Dirigo did not release the Compilations, it relies on the data contained in them to advise its clientele on market rents and other topics. The court is not on either side of this issue and is unpersuaded that this factor favors either party. At most, it modestly advantages the City.

> vi.     *Plaintiffs cannot satisfy section 1542(4)(A), the first part of the MTSA's "trade secret" test.*

15

Reviewing the factors as a whole, the court concludes that the Compilations are not "trade secrets" within the meaning of the MTSA, fall outside of Maine Rule of Evidence 507 and Maine Rule of Civil Procedure 26(c)(7), and thusly are not excepted from public disclosure under FOAA. For the sake of completeness, the court considers the remaining requirements imposed by 10 M.R.S. § 1542(4)(B).

B. <u>10 M.R.S. § 1542(4)(B).</u>

Maine courts also consider various factors to determine whether information "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy" within the meaning of section 1542(4)(B):

> (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which employees and others involved in the plaintiff's business know the information; (3) the nature and extent of measures the plaintiff took to guard the secrecy of the information; (4) the existence or absence of an express agreement restricting disclosure; and (5) the circumstances under which the information was disclosed to any employee, to the extent that the circumstances give rise to a reasonable inference that further disclosure without the plaintiff's consent is prohibited.

*Spottiswoode*, 1999 ME 79, ¶ 27 n.7, 730 A.2d 166 (citations omitted).

> *i. The extent to which the information is known outside the Plaintiffs' business.*

The information contained in the Compilations is not well-known outside the Plaintiffs' business. Rents for individual units can be learned through observing Plaintiffs' advertisements, to the extent they reflect actual rents, or by (and in theory through) individual tenants who rent a unit from Plaintiffs. Likewise, Dirigo relies on its knowledge of Plaintiffs' actual rents when it provides guidance to its clients on market rents or other topics. These sources do not provide means to learn about the aggregated information contained in the compilations. Apart from participation in Plaintiffs'

16

business, there is no way to know the information in question. This factor favors finding a "trade secret."

> *ii.      The extent to which employees and others involved in the Plaintiffs' business know the information.*

Plaintiffs' share a common individual owner and sole employee in Mr. Lathrop. In consideration of the closely held nature of the Plaintiffs as companies, this factor is not applicable to this case.

> *iii.      The nature and extent of measures the plaintiff took to guard the secrecy of the information.*

As discussed above in the analysis for section 1542(4)(A)(iii), *see supra* 14, the record evidence of the nature and extent of Plaintiffs' measures undertaken to guard the secrecy of the Compilations and the information contained therein is insufficient to favor finding they qualify as "trade secrets."

> *iv.      The existence or absence of an express agreement restricting disclosure.*

As discussed above, Plaintiffs have no NDAs in place with Dirigo, Dirigo's staff, or Plaintiffs' individual tenants. Nor does Plaintiff have any other express agreement with Dirigo restricting its disclosure of the Compilations. The implied agreement upon which Mr. Lathrop places his confidence in Dirigo is not enough, and this factor disfavors finding a "trade secret."

> *v. The circumstances under which the information was disclosed to any employee, to the extent that the circumstances give rise to a reasonable inference that further disclosure without the Plaintiffs' consent is prohibited.*

Plaintiffs requested their property manager and leasing agent at Dirigo assist them with their compliance with the City's ordinances by preparing the Compilations. Dirigo, through its work for Plaintiffs, was in a unique position to do so. These circumstances

17

produce a reasonable inference that further disclosure without Plaintiffs' consent was prohibited. This factor favors finding a "trade secret."

> vi. *Plaintiffs cannot satisfy section 1542(4)(B), the second part of the MTSA's "trade secret" test.*

Within this analysis to determine whether Plaintiffs' Compilations are "the subject of efforts that are reasonable under the circumstances to maintain its secrecy," the court concludes that the Plaintiffs failed to meet their burden to prove a "trade secret" with respect to the second segment of the MTSA's two-part test as well.

C. <u>Plaintiffs did not carry their burden to prove the Compilations constitute a "trade secret" within the meaning of the MTSA.</u>

Even though the court concludes that the *Spottiswoode* factors applied to determine whether information "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy" within the meaning of 10 M.R.S. § 1542(4)(B) are inconclusive, the statute requires satisfaction of each subsection to establish information as a "trade secret" as a matter of law. 10 M.R.S. § 1542(4). Thus, Plaintiffs' inability to carry their burden to prove that each compilation "derives independent economic value . . . from not being generally known [or] readily ascertainable" as required by section 1542(4)(A) renders their relief sought unavailable to them.

CONCLUSION

Based on the foregoing, the entry will be: judgment for Defendant, the City of Portland.

SO ORDERED.

The Clerk is requested to enter this Order on the Docket, incorporating it by reference pursuant to Maine Rule of Civil Procedure 79(a).

Date: /2/1/22

Thomas R. McKeon
Justice, Maine Business and Consumer Court

BCD-CIV-2022-42

*BAYVIEW COURT ASSOCIATES, LLC, et al.*

    *Plaintiff*

*v.*

*CITY OF PORTLAND*

    *Defendants*


Party Name:                                   Attorney Name:

*BAYVIEW COURT ASSOCIATES, LLC, et al*    Clifford Ruprecht, Esq.
                                        **Roach Ruprecht Sanchez & Bischoff**
                                        527 Ocean Ave, Suite 2
                                        Portland, ME 04103


CITY OF PORTLAND                      Amy Mcnally, Esq.
                                          **Woodman Edmands Danylik Austin Smith**
                                        PO Box 468
                                        Biddeford, ME 04005-0468
                                    Anne Torregrossa, Esq.
                                        **Brann and Isaacson**
                                        389 Congress Street
                                        Portland, ME 04101


**Intervenor**

    MTM ACQUISITION, INC             Sigmund Schuts, Esq.
                                        **Preti Flaherty Beliveau Pachios**
                                        One City Center
                                        PO Box 9546
                                        Portland, ME 04112-9546